UNITED STATES, Appellee,

v.

**Joseph A. ROBBIO, Defendant, Appellant.**

No. 98–1785.

United States Court of Appeals, First Circuit.

Heard June 8, 1999.

Decided Aug. 2, 1999.

Barry S. Pollack with whom Timothy C. Blank and Dechert Price & Rhoads were on brief for appellant.

Donald Campbell Lockhart, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, was on brief for appellee.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LIPEZ, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Joseph Robbio appeals from his conviction in the district court on one count of conspiracy to transport counterfeit securities, 18 U.S.C. §§ 371, 2314; one count of possession of implements for making counterfeit securities, *id.* § 513; one count of production of false identification documents, one count of possession of false identification documents, and one count of possession of document-making implements used in production of false identification documents, *id.* § 1028; and two counts of transporting counterfeited securities, *id.* § 2314. Robbio argues that the court failed properly to instruct the jury as to how it should evaluate the testimony of a co-defendant who cooperated with the government. He also contends that the district court erroneously calculated his sentence. We *affirm* both the conviction and the sentence.

## I. *FACTS*

We state the facts in a light most favorable to the jury's verdict. *See United States v. Gaines,* 170 F.3d 72, 75 (1st Cir.1999).

Around December 1995, Robbio embarked on a counterfeiting scheme headquartered in the basement of his home in Cranston, Rhode Island. Using the names and addresses of people with obsolete checking accounts, Robbio created counterfeit checks and driver's licenses with equipment located in his basement. He and three coconspirators used the counterfeit materials at retail chain stores in New England that provided cash refunds for returned purchases under $200. They repeatedly purchased less than $200 of merchandise, paid with counterfeit checks that were verified by counterfeit driver's licenses, and then returned the goods for cash refunds before the checks bounced. Until the scheme was interrupted in July, 1997, Robbio and his coconspirators passed more than 700 counterfeit checks possessing a total face value of more than $115,000.

In March, 1997, Robbio recruited Victor Kiendra to assist him. He explained the counterfeiting scheme to Kiendra and asked him to execute it at several New England chain stores. In exchange, Robbio offered to share with Kiendra fifty percent of the profits from each store Kiendra defrauded, the same arrangement Robbio had with his two other coconspirators. From March to July, 1997, Kiendra helped Robbio execute the scheme in Rhode Island, Massachusetts, New Hampshire, and Connecticut.

Kiendra was arrested on July 18, 1997, for failing to pay outstanding traffic citations. The Fall River Police discovered some of the counterfeit licenses in Kiendra's possession and contacted the United States Secret Service. Kiendra immediately agreed to cooperate with the government. On the day of his arrest, Kiendra placed a monitored, recorded telephone call to Robbio.

During the telephone conversation, Robbio made several references to the counterfeit check scheme. When Kiendra told Robbio that the police had not found "those other things," Robbio responded, "You're lucky.... Oh my God, you would have been spending the weekend in jail if you had those." When Kiendra said he would call Robbio later in the week because he had to "take a little time off," Robbio replied, "Yeah, I know. I'll go with ya.... We'll go to Caldor's ... I'm gonna lay off those other places.... If you lay off, maybe we can still make a grand here or there around Christmas time ya know?" Five days later, Kiendra placed a second monitored, recorded call to Robbio. In that conversation, Robbio told Kiendra, "I'll get everything ready for tomorrow.... We'll hit some Caldor's. We'll try some new spots." Recordings of these conversations were introduced into evidence at Robbio's trial.

The day after the second phone call, government agents executed a search warrant at Robbio's home, located at 1149

Narragansett Boulevard in Cranston. They discovered and seized several items in the basement that had been used to execute the counterfeit check scheme: two computers with check-making programs; special pre-printed paper used for making checks, located next to one of the computers; hundreds of counterfeit checks; a manual describing how to create checks; counterfeit driver's licenses with the photographs of Robbio, Kiendra, and another coconspirator, Steven LaFazia; partially completed counterfeit driver's licenses; two laminating machines; a Polaroid camera; and a guide to the driver's licenses of the fifty states. The agents also searched a car that was parked in the driveway and registered to Robbio. Inside the vehicle, they found and seized a bag from T.J. Maxx containing merchandise, a receipt, and several personal checks. The foregoing items were introduced into evidence at Robbio's trial.

On October 16, 1997, Kiendra entered into a plea agreement with the government in which he pleaded guilty to one count of conspiring to transport counterfeited securities and agreed to testify for the government at Robbio's trial. In exchange, the government dismissed the remaining counts against him and sought a reduced sentence. At Robbio's trial, Kiendra testified that Robbio had recruited him into the counterfeit scheme, provided him with the counterfeit checks and licenses, and accompanied him on many trips to retail stores. He also testified that between March and July of 1997, he personally executed the scheme "a couple of hundred times" and passed approximately $39,000 in counterfeit checks. In addition to Kiendra, the prosecution's witnesses included the government agents who executed the search warrant and analyzed the physical evidence, recordkeepers for the stores that were defrauded, and a victim of the counterfeit check scheme.

Robbio elected not to testify or call witnesses in his defense. Based upon his cross-examination of Kiendra, Robbio's counsel argued to the jury that the government's case depended entirely on the unreliable testimony of a single witness. Robbio maintained that Kiendra had masterminded the check scheme and "set up" Robbio by using Robbio's basement as the center of operation. Robbio further argued that Kiendra testified falsely against him in order to reduce his own sentence.

Following a two-day trial, the jury returned a guilty verdict on all seven counts of the indictment. The district court sentenced Robbio to 48 months of imprisonment.

## II. ANALYSIS

### A. The Jury Instructions

Robbio challenges his conviction on the grounds that the district court incorrectly instructed the jury as to how it should evaluate Kiendra's testimony. Without defense objection, the court instructed the jury *inter alia* as follows:

> You have heard testimony from a Government witness, Victor Kiendra, who pleaded guilty to charges arising out of the same facts as this case. You are instructed that you are [to] draw no conclusions or inferences of any kind about the guilt of the defendant on trial from the fact that a prosecution witness plead guilty to similar charges.

> A witness' decision to plead guilty was a personal decision about his own guilt. It may not be used by you in any way as evidence against or favorable to the defendant here on trial.

Robbio maintains that, even without a defense request, the district court should have included a cautionary instruction to exercise "greater care" when assessing the credibility of a cooperating codefendant witness. *See United States v. Fernandez,* 145 F.3d 59, 62 (1st Cir.1998). Robbio further contends that the district court compounded its error by instructing the jury that it could not consider Kiendra's guilty plea as evidence favorable to Rob-

bio. Neither of these contentions warrant reversal of Robbio's conviction.

 Because Robbio made no objection to the given instructions nor requested the "greater care" instruction, we review only for plain error. *See* Fed. R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). For such an error to exist, it must indeed be "plain" or "obvious," and it must "affect substantial rights"; that is, "[i]t must have affected the outcome of the district court proceedings." *Fernandez,* 145 F.3d at 63 (quoting *Olano,* 507 U.S. at 734, 113 S.Ct. 1770). Additionally, an appellate court will remedy such an error only if it appears that it "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 63.

This court has held that a district court need not give an unrequested cautionary instruction as to the jury's acceptance of a coconspirator's testimony where the testimony "looks internally consistent and credible,'" even if the testimony is uncorroborated. *Id.* at 62 (quoting *United States v. House,* 471 F.2d 886, 888–89 (1st Cir.1973)).[1] Kiendra's testimony was, overall, internally consistent and credible. Robbio points out only one instance of a purported internal inconsistency: at trial, Kiendra initially denied possessing keys to Robbio's residence, only to admit upon further questioning that he did briefly possess them once, while Robbio was away on vacation. The admission, however, might be considered as little more than a clarification of Kiendra's earlier statement; it did not detract significantly from the consistency and credibility of his testimony as a whole. Kiendra's testimony was not, moreover, uncorroborated. It was supported by a considerable body of other evidence, such as the highly inculpatory items seized from the basement of Rob-

bio's home and his car, and the two recorded telephone conversations in which Robbio stated his intention to execute the scheme at some Caldor's stores. Thus, the district court's omission of the unrequested "greater care" instruction fell well short of amounting to plain error.

Robbio also insists that it was plain error for the court to state that the jury could not use a witness' decision to plead guilty "in any way as evidence against *or favorable to* the defendant." [Emphasis supplied.] Robbio points out that, in assessing the credibility of Kiendra's testimony, the jury was entitled to weigh the fact that Kiendra was testifying pursuant to a contingent plea agreement. The jury, he suggests, might have interpreted the challenged instruction as denying it the right to consider whether Kiendra's plea agreement, premised on testifying for the government in return for a reduced sentence, affected the truthfulness of his testimony against Robbio. Given, however, the court's other instructions, and the fact that the effect of the plea agreement on Kiendra's credibility was discussed extensively at trial, we doubt that the challenged language (which related narrowly to "a witness' decision to plead guilty" and to the fact that it was "a personal decision about his own guilt") was intended by the court, or was likely construed by the jury, as denying the jury the right to assess Kiendra's credibility in light of his own plea agreement.

 Jury instructions must be gauged "in the context of the charge as a whole, not in isolation." *United States v. Boylan,* 898 F.2d 230, 244 (1st Cir.1990). Shortly before its instruction concerning Kiendra's guilty plea, the district court stated:

> In evaluating the testimony of witnesses you may consider several things. The opportunity of the witness to have acquired knowledge of that which they

---

**1.** Appellant cites to *McMillen v. United States,* 386 F.2d 29, 32–37 (1st Cir.1967), for a different rule. The Supreme Court's post–1967 clarification of the plain error standard, and

this circuit's own subsequent precedent, make it clear that *Fernandez* sets forth accurately the standard currently applicable in the present situation.

testified to, their conduct and demeanor while testifying, *their interest or lack of interest, if any, in the outcome of this case, whether they've been convicted of a felony,* their intelligence or lack thereof, and the probability or improbability of the truth of their testimony.

(Emphasis supplied). This instruction conveyed to the jury that it could consider Kiendra's interest in the case and his criminal history when assessing his testimony. Moreover, Kiendra's plea agreement was introduced into evidence, and Robbio's counsel cross-examined Kiendra extensively about the terms of that agreement and Kiendra's motivation to testify against Robbio. The government at no time questioned Robbio's entitlement to pursue such a line of inquiry at trial, or to argue, as he did, that the plea agreement diminished Kiendra's credibility.

 Finally, the case against Robbio was very strong, wholly apart from Kiendra's testimony: the items found in the basement of his home and in his car; the testimony of other witnesses, including a victim of the counterfeit check scheme and government agents who executed the warrants and analyzed the evidence; and the two recorded telephone conversations in which Robbio stated his intention to continue the counterfeiting scheme. Even supposing it is possible to read the challenged instruction as erroneously inhibiting the jury's scrutiny of the plea agree-

ment for impeachment purposes, we doubt it reached the level of plain error.[2] We see little reason to suppose either that the parties or jury interpreted this at most ambiguous instruction in the prejudicial manner now asserted or that it had any effect on the outcome of the case.

## B. Sentencing issues

### 1. Intended Loss

 At sentencing, the district court increased Robbio's base offense level by eight levels based upon a loss calculation of $237,485. *See* U.S.S.G. § 2F1.1(b)(1) (eight-level increase for loss between $200,000 and $350,000). That figure comprised actual loss in the amount of $115,985, representing the total face value of the 714 counterfeit checks passed by Robbio and his coconspirators, as well as intended loss in the amount of $121,500, representing the 750 blank checks found during the execution of the search warrant.[3] Robbio contends that the court clearly erred by considering losses from wrongdoing that he did not intend to commit immediately, but rather might have considered committing at a point several months in the future.

 We review a district court's intended loss findings for clear error. *United ed States v. Rizzo,* 121 F.3d 794, 803 (1st Cir.1997). The sentencing guidelines pro-

2. Robbio refers to several other purported deficiencies in the jury charge, none of which were challenged at trial. Specifically, we do not find plain error in Robbio's assertion that the district court erred by using the terms "willfully" and "willingly" interchangeably when instructing the jury about the requisite mens rea for the charge of conspiracy. Robbio makes no attempt to explain why this deviation prejudiced him in any way. Nor, in light of the powerful evidence of Robbio's guilt, can we say that any of the purported misstatements affected the outcome of the trial. Similarly, we conclude that the district court did not err in instructing the jury that in order to convict on the charge of possession of implements used for the making of counterfeit securities, it must find that the equipment seized from Robbio's basement was ei-

ther designed for or particularly suited to making counterfeit items. *See* 18 U.S.C. § 513(b). Nor do we discern plain error in the district court's description of reasonable doubt as "a doubt for which you can give some sound reason." *See United States v. Glenn,* 828 F.2d 855, 861 (1st Cir.1987); *United States v. MacDonald,* 455 F.2d 1259, 1262 (1st Cir.1972).

3. In calculating the intended loss amount of $121,500, the district court took the average face value of the counterfeit checks that Robbio and his coconspirators had passed before his arrest and multiplied that figure by the number of blank checks. Robbio does not challenge the specifics of the district court's computation.

vide that if the loss that the defendant intended to inflict can be determined, "this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, comment (n.8). The loss "need not be determined with precision"; rather, the district court's reasonable estimate will suffice. *Id.* at n. 9.

We will uphold an intended loss determination "where there is good evidence of actual intent and some prospect of success ...". *United States v. Egemonye,* 62 F.3d 425, 428 (1st Cir.1995). Strong evidence supports the district court's determination that Robbio intended to create and pass additional counterfeit checks: notably, the package of blank check paper found next to the computer in Robbio's basement; his statements in the recorded telephone conversations that he and Kiendra would "go to Caldor's" and "hit some Caldor's"; and his statement in the second conversation with Kiendra that he would "get everything ready for tomorrow." [4]

There is ample evidence as well of Robbio's prospect of success had he not been arrested. He and his coconspirators had already executed the scheme more than 700 times before they were interrupted. The court properly weighed the past losses inflicted by the conspiracy in calculating the intended loss. *See* § 2F1.1, comment (n.9) (district court's estimate of intended loss may be based on the approximate number of victims and average of loss to each victim). Accordingly, we perceive no error in Robbio's sentence enhancement for intended loss.

### 2. *Refusal to depart downward*

At sentencing, Robbio requested a downward departure pursuant to U.S.S.G.

§ 2F1.1, comment (n.11), which states, in relevant part, that "[in] a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense." The district court denied the request, stating, "For all the reasons I gave in determining the appropriate loss in this case, I simply do not see where this is one of those few instances which the note says that the loss overstates the seriousness of the offense." Robbio now argues that the court erroneously determined that it lacked authority to depart downward on "grounds related to overstated loss," including "multiple causation," "sentencing entrapment," and "disparity in loss calculation."

Under the long-standing rule that "a criminal defendant cannot ground an appeal on a sentencing court's discretionary decision not to depart below the guideline sentencing range," we lack jurisdiction to review a district court's decision to reject a downward departure. *United States v. Reeder,* 170 F.3d 93, 109 (1st Cir.1999). Our review of the transcript of the sentencing hearing demonstrates that the district court fully comprehended its authority to depart downward in an appropriate case, but denied Robbio's motion because of its perceived lack of merit. Because Robbio challenges the district court's exercise of discretion not to depart downward, we do not have jurisdiction to entertain his argument. *See United States v. Field,* 39 F.3d 15, 21 (1st Cir.1994). Furthermore, most of Robbio's current arguments for a downward departure are based on grounds he did not raise in the district court, a fact that further forecloses our consideration of those grounds. *Id.*

4. The fact that Robbio stated in the first recorded conversation that he intended to "lay off those other places" and possibly "make a grand or two around Christmas" does not alter our conclusion that the finding of requisite intent was supported by sufficient evidence. In both recorded conversations, Robbio indicated his intent to immediately execute the scheme at Caldor's, if not at the "other places." In any event, Robbio points to no authority for the proposition that enhancing a sentence for intended loss based on conduct planned for a point in the future amounts to clear error, and we are aware of none.

### 3. *Organizer or leader*

■ The district court found that Robbio was a leader or organizer of the counterfeiting scheme, and consequently increased his base offense level by four levels. *See* U.S.S.G. § 3B1.1(a) (four-level increase if defendant was an organizer or leader of a criminal activity that involved five or more participants or was "otherwise extensive"). Robbio contends that this finding was not based upon sufficient evidence that he played a leading or organizing role.

■ We review the district court's findings for clear error. *See United States v. D'Andrea,* 107 F.3d 949, 956 (1st Cir. 1997). The sentencing guidelines state that in determining whether a defendant is a leader or organizer, the court should consider (1) whether the defendant exercised decision-making authority, (2) the nature of his participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, comment (n.4). There need not be proof of each and every factor for a defendant to be deemed an organizer or leader. *See United States v. Tejada Beltran,* 50 F.3d 105, 111 (1st Cir.1995).

At sentencing, the district court found that Robbio recruited Kiendra, directed him in executing the scheme, and took 50 percent of the revenues from the scheme. It also found that the criminal activity was extensive, covering several states and involving hundreds of transactions. Furthermore, evidence at trial showed that Robbio organized the scheme from the basement of his home, supervised two other coconspirators besides Kiendra in passing the counterfeit checks, and collected 50 percent of their revenues as well, regard-

less of whether he accompanied them to the stores. This evidence satisfies many, if not all, of the factors set forth above, and is more than sufficient to support the district court's finding that Robbio was a leader or organizer of the scheme. *See United States v. Kneeland,* 148 F.3d 6, 16 (1st Cir.1998).

### 4. *Prior convictions*

■ The district court determined that Robbio's criminal history placed him in category III. *See* U.S.S.G. § 5A (table). Robbio argues that two of his prior convictions, for trespass and counterfeiting, should not have been considered in the calculation. He contends that these earlier offenses did not take place within ten years of the unlawful conduct in the present action, which he asserts started around March 1997. *See* U.S.S.G. § 4A1.2(e)(2)(criminal history category calculation includes consideration of sentences imposed within ten years of offense).

■ Because Robbio did not assert this argument in the district court, he has forfeited it absent, at least, a showing of plain error.[5] Far from demonstrating plain error, the argument lacks merit altogether. For purposes of determining a criminal history category under § 4A1.2(e)(2), the ten-year period is determined by the date of sentencing, not of conviction. *United States v. Perrotta,* 42 F.3d 702, 703–04 (1st Cir.1994). A review of the pre-sentence report reveals that Robbio was sentenced on the trespass conviction on July 15, 1987, and on the counterfeiting conviction on November 20, 1987. Accordingly, these convictions were properly considered by the district court in calculating Robbio's criminal history category.

*Affirmed.*

---

**5.** Similarly, Robbio's argument on remand that a prior conviction for disorderly conduct

should not have been counted also was forfeited.