# United States Court of Appeals
## For the First Circuit

No. 99-1952

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE ORLANDO-FIGUEROA,

Defendant, Appellant.

No. 99-1954

UNITED STATES OF AMERICA,

Appellee,

v.

ANGEL E. RODRIGUEZ-CABRERA A/K/A "BUZO,"

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Circuit Judge,
Coffin, Senior Circuit Judge,

and Lipez, <u>Circuit Judge</u>.

———————

<u>Vilma M. Dapena-Rodriguez</u> for appellant Orlando-Figueroa.
<u>Juan A. Pedrosa-Trapaga</u> for appellant Rodriguez-Cabrera.
<u>María Domínguez-Victoriano</u>, Assistant United States Attorney, with whom <u>Michelle Morales</u>, United States Attorney, and <u>Camille Veléz-Rive</u>, Assistant United States Attorney, were on brief, for appellee.

———————

October 6, 2000

———————

**LYNCH, <u>Circuit Judge</u>**.  Disasters are said to bring out the best and the worst in people.  In September 1998 Hurricane Georges wreaked massive destruction in Puerto Rico.  The municipality of Toa Alta was badly hit and it sought federal disaster assistance monies from FEMA, the Federal Emergency Management Agency.  The influx of large disaster relief funds can also provide fertile opportunities for corruption.  In 1999 a jury convicted Angel E. Rodriguez-Cabrera, the Mayor of Toa Alta, and his friend, José Orlando-Figueroa, the owner of a construction company, of conspiracy and of corruptly soliciting a $2.5 million bribe from a private company as the cost of the company's obtaining the debris

cleanup contract for the area.  <u>See</u> 18 U.S.C. §§ 371, 666(a)(1)(B). The two were acquitted on extortion charges.  Each was sentenced to a term of 57 months.  The two men now appeal, raising more than a dozen arguments.  We reject the attacks on both the convictions and sentences and affirm.

## I.

Viewed in the light most favorable to the prosecution, the facts of the underlying crime are as follows.

Rodriguez-Cabrera, nicknamed "Buzo," was the Mayor of Toa Alta, and Orlando-Figueroa was a contractor and the President of JOF Corporation in Puerto Rico. Toa Alta qualified for federal disaster assistance through FEMA after being struck by Hurricane Georges in

September 1998.  In late September 1998, Orlando-Figueroa entered into a business venture with David Crawford, the president of MD Construction, a Miami-based company, and John Shavers, president of JESCO Construction Corporation, a disaster cleanup company based in Mississippi, and Crawford's former partner in other business ventures. The purpose of this venture was to secure debris cleanup contracts with local municipalities in Puerto Rico.  Eventually, JESCO entered into a contract with the municipality of Toa Alta (through its mayor, Rodriguez-Cabrera) for post-hurricane debris disposal.[1]  The town was to receive a "tipping fee" based on the amount of debris "tipped" into its landfill from dump trucks.  FEMA would pay for debris disposal (and thus the tipping fee as well) based on the amount of debris certified to it by town officials.

In the course of negotiating the contract, Crawford and Shavers met with Orlando-Figueroa and Rodriguez-Cabrera on October 22, 1998, at Rodriguez-Cabrera's office in the City Hall.  During this meeting, Orlando-Figueroa told Crawford and Shavers that the Mayor wanted $2.5 million, apparently in exchange for the contract to JESCO.  Crawford

_____

[1]      Cleanup consisted of picking up the debris, grinding it, and dumping it in Toa Alta's landfill.  The original contract called for the town to pay JESCO $79.00 per cubic yard of ground-up debris, with an estimate of 100,000 cubic yards, for a total payment to JESCO of $7.9 million.  The contract was later amended to provide for a per cubic yard payment of $35.00 and included the charge to be paid by JESCO to use Toa Alta's landfill.

and Shavers, according to their own testimony, were confused by the statement. Orlando-Figueroa repeated that the Mayor wanted $2.5 million. Mayor Rodriguez-Cabrera then tapped his chest and said, "Buzo, two and a half million." After the meeting, Orlando-Figueroa informed Crawford and Shavers that the Mayor had both Puerto Rican and federal officials in his pocket and that he controlled the island. Shavers understood the $2.5 million as extortion money to be paid from funds fraudulently obtained from FEMA;[2] the defendants at trial characterized the sum as being the town's legitimate tipping fee for the disposal of an estimated 500,000 cubic yards of debris at $5 per cubic yard.

On November 9, 1998, Shavers informed the FBI of the kickback scheme. The FBI wired Shavers for his future meetings with defendants. On November 10, 1998, Orlando-Figueroa traveled to Mississippi to meet with Shavers. He informed Shavers that Rodriguez-Cabrera also wanted a pick-up truck and a three-wheeled motorcycle shipped with the tub grinder (a machine used to grind debris) that was to be used for the job. He also told Shavers that Rodriguez-Cabrera wanted JESCO to give him the tub grinder. On the same day, an FBI undercover agent met with Orlando-Figueroa and Shavers. During the meeting, Orlando-Figueroa explained to the undercover agent that JESCO needed to pay him

---

[2] The money, apparently, was to come from exaggerated reports of the amount of debris deposited and false invoices that JESCO was to fill out and submit to Toa Alta for later submission to FEMA.

(Orlando-Figueroa) $2.5 million in order to grease Rodriguez-Cabrera's palm.

The FBI also taped numerous telephone conversations between Shavers and Orlando-Figueroa and Rodriguez-Cabrera. In the calls, Shavers discussed the $2.5 million, how he had secured the money, and how to deliver it to Rodriguez-Cabrera. At one point, Orlando-Figueroa told Shavers that Rodriguez-Cabrera thought the phones might be tapped and that they should not discuss the scheme over the telephone.

On November 24, 1998, Shavers delivered $20,000 to Orlando-Figueroa as an initial deposit towards the $2.5 million. This transaction was videotaped. Orlando-Figueroa used $3,000 to pay a debt at a tile store and then delivered $12,000 of the money to Rodriguez-Cabrera in the Mayor's office. Orlando-Figueroa left and was arrested outside, and Buzo's chauffeur raced inside to tell the Mayor the news. FBI agents then entered the building, through a milling crowd of over one hundred people, and went to Rodriguez-Cabrera's office. Agent John Johnson identified himself and informed Mayor Rodriguez-Cabrera that he was under arrest. Rodriguez-Cabrera asked, "What is this about?" Johnson responded that it was about the money. Rodriguez-Cabrera nodded. Johnson then asked where the money was, and Rodriguez-Cabrera pointed at his desk. Johnson then asked for consent to open the drawer; Rodriguez-Cabrera opened it himself and handed the money to Johnson. Rodriguez-Cabrera was not given Miranda warnings. See

Miranda v. Arizona, 384 U.S. 436 (1966).  While this was happening, the Mayor's staff members were banging on the walls and yelling.  The agents wanted to move quickly to a more secure place.

The defense theory was that the defendants never demanded a $2.5 million kickback, that the $2.5 million figure represented the tipping fee to be paid to the city for use of its landfill, and that it was Shavers who was corrupt and who wanted to submit falsified documents to FEMA to increase his profits.  Both defendants testified.  The jury rejected their theory and found them guilty.

## II.

Against this background, we discuss the issues raised on appeal. Of the issues, the most serious are the denial of a continuance of the trial and the exclusion of an old criminal conviction of Shavers.

1. Denial of the Defendants' Requests for Continuance Based on Ability to Prepare for Trial

The defendants filed five motions for continuance of trial, articulating three different grounds: (1) inadequate time to prepare; (2) inadequate time to inspect the jury selection records; and (3) excessive, negative pretrial publicity.[3]  The argument that has the most

---

[3]    It appears that only Rodriguez-Cabrera filed any motions for continuance, although Orlando-Figueroa argues in his brief that the district court erred in not granting a continuance based upon inadequate time to prepare for trial. Because we reject the argument, we do not inquire as to whether Orlando-Figueroa preserved the issue.

surface plausibility is that defendants were not given adequate time to prepare for trial.

The district court has broad discretion to grant or deny continuances. See United States v. Brand, 80 F.3d 560, 564 (1st Cir. 1996). A district court's decision stands unless it is a "manifest abuse of discretion." United States v. Devin, 918 F.2d 280, 291 (1st Cir. 1990) (denying mid-trial continuance) (citing Morris v. Slappy, 461 U.S. 1, 11-12 (1983)). That discretion is nonetheless limited by the defendants' constitutional rights to effective assistance of counsel and to the testimony of defense witnesses. United States v. Soldevila-Lopez, 17 F.3d 480, 487 (1st Cir. 1994).

Among the factors to be considered in reviewing a denial of a motion for a continuance are the amount of time necessary for trial preparation, the amount of time actually available for preparation, the defendant's diligence, the inconvenience to the court and other parties, the likely utility of a continuance, and any unfair prejudice caused by the denial. United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995), cert. denied, 517 U.S. 1105 (1996); Soldevila-Lopez, 17 F.3d at 488.

The defendants were arrested and arraigned on November 24, 1998. Soon thereafter (it is not clear exactly when), the defendants were provided with copies of most of the FBI surveillance tapes. Defendants were indicted on December 11, 1998. The district court held

a status conference on January 5, 1999, at which time the trial date was set for February 3, 1999. Ultimately, although a jury was impaneled on February 3, opening arguments and the presentation of evidence was postponed until February 8 to accommodate a personal request by Orlando-Figueroa's attorney.

At the status conference, the court ordered the government to turn over all <u>Brady</u> and <u>Giglio</u> materials by January 14, 1999, all transcripts of the audio tapes by January 15, 1999, and all Jencks Act discovery materials, including grand jury minutes, by January 22, 1999. The court also ordered the government to file a written Fed. R. Crim. P. 12(d)(2) designation of evidence by January 8, 1999.

The defendants' main argument is that on January 13, 1999, the government overwhelmed them with 2,000 pages of documents, 19 tapes and transcripts, and 2 video tapes and transcripts, and that they did not have enough time to prepare for trial. In addition, the defendants claim that the government provided them with sixty pages of FBI Form 302's and some <u>Jencks</u> material (they do not say how much) on January 26, 1999, one week before trial, and with some corrected transcripts on February 1, two days before trial.

Although the bulk of the complained-about materials were provided to the defendants on January 13, it was not until six days later, on January 19, that the defendants filed their first motion for a continuance. There is no explanation in the briefs for this delay.

That first motion for a continuance (based on inadequate time to prepare for trial) and the defendants' subsequent motions were all denied by the district court.  There is no mechanical test or formula to apply in reviewing a decision to grant or deny a continuance; each case must be evaluated on its own facts.  See United States v. Torres, 793 F.2d 436, 440 (1st Cir. 1986).

The district court, in denying defendants' motion, first pointed out that defendants had had in their possession the only relevant videotape and fifteen audio tapes consisting of short telephonic conversations prior to the indictment, which had occurred on December 11, 1998.  Next, the court noted that it had taken "meticulous steps" to ensure that defendants would receive what they needed to prepare their defense.  Specifically, the court had ordered the government (1) to file its Fed. R. Crim. P. 12(d)(2) designation of evidence by January 8, (2) to turn over Brady and Giglio material by January 14, (3) to deliver transcripts of the audio tapes by January 15, and (4) to produce Jencks Act discovery material, including grand jury minutes, by January 22.

Turning to the factors set out in Saccoccia and Soldevila-Lopez, the trial court noted that defendants had received total access to the necessary information and that, during a conference held on February 3, Rodriguez-Cabrera's counsel had recognized that the file was complete. The court thus determined that defendants had adequate time to prepare

-10-

their defense and that a continuance would not be useful.  As to inconvenience, the court stated that it had a full docket with many multi-defendant cases already scheduled for trial.  The court concluded that defendants had not demonstrated unfair prejudice.

There was no error in denial of a continuance on grounds of inadequate time to prepare.  The tapes, which were the heart of the prosecution's case, were in defendants' hands by December 11, 1998, almost two months before trial.  Defendants could have had transcripts prepared then, but chose not to, and relied on the transcripts the government prepared.  They thus cannot complain about the unavailability of transcripts, which are, we note, simply aids to the jury.  Defendants also say that if they had had more time, they might have discovered two pieces of evidence which became the basis of the new trial motion.  We discuss those later and pause only to note that there is no reason to think either piece of evidence would have made any difference.  Also, given the trial court's ruling that impeaching evidence (past criminal convictions) as to Shavers was inadmissible, further time to discover such evidence was pointless.  If defendants wanted, as they now say, an expert on debris (for reasons still vague), such an expert should have been sought earlier.  While the trial judge held defendants to a tough schedule, in the absence of a showing of unfair prejudice to defendants, there was no manifest abuse of

discretion. The Speedy Trial Act, 18 U.S.C. § 3161, attempts, after all, to get defendants to trial within 70 days of indictment.

2.  Inadequate Time to Inspect the Jury Selection Records

Criminal defendants have an absolute right to inspect jury selection records pursuant to 28 U.S.C. § 1867(f). See United States v. Royal, 100 F.3d 1019, 1025 (1st Cir. 1996). These defendants sought to examine the district court's jury selection records in order to prepare a challenge to the requirement that jurors understand English. Consequently, on January 19, 1999, the defendants filed a motion for the disclosure of all jury selection documents. On January 25, after an in-chambers conference, the district court granted access to the documents. While acknowledging the defendants' right to inspect the jury selection documents regardless of their reason for wanting to do so, the court also clearly and correctly explained that any challenge to the English proficiency requirement was foreclosed by First Circuit precedent. See United States v. Flores-Rivera, 56 F.3d 319, 326 (1st Cir. 1995).

On January 27, the defendants filed a motion requesting a stay of proceedings to give them time to gather information on jury selection and prepare a challenge. Because it felt the motion did not contain the requisite sworn statement of facts which, if true, would demonstrate that the jury selection method failed to comply with

-12-

statutory requirements, see 28 U.S.C. § 1867(d), the district court summarily denied the continuance. On February 1, the defendants then filed a second motion to stay proceedings in order to inspect the jury selection records and prepare a challenge. On February 2, this motion was denied as well, for several reasons. The court noted again that any challenge to the English language requirement was foreclosed by circuit precedent, and that the motion was untimely. Pursuant to 28 U.S.C. § 1867(a), a defendant may file a motion to stay proceedings premised upon a challenge to jury selection procedures "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered . . . the grounds [for the challenge]." Id. The court found that the defendants had made clear at the January 5 status conference that they intended to challenge the English language requirement, but did not file their first motion to stay proceedings until January 27, thus placing them beyond the seven-day time limit of § 1867(a).

Although the trial judge was in error on several of his rulings -- matters we address to give guidance -- in the end none of these errors would cause a reversal here, for various reasons.

There are two problems with the district court's rulings. First, Royal held that "a district court may not require a defendant requesting access to jury selection records to submit with that request 'a sworn statement of facts which, if true, would constitute a

-13-

substantial failure to comply with the provisions of this title.'" 100 F.3d at 1025 (quoting § 1867(d)). Thus, only a formal § 1867(a) motion actually challenging the jury selection process must be accompanied by such a statement, not a request to examine the jury selection records or a motion for a continuance to have time to study those records.

Second, the district court was in error in finding tardy defendants' request for a stay in order to inspect the jury selection records. The seven-day filing requirement applies only to the § 1867(a) motion actually challenging the jury selection process. That is, subsection (a) itself refers only to such a motion, not to a preliminary motion seeking access to jury selection documents. See United States v. Alden, 776 F.2d 771, 773-75 (8th Cir. 1985) (a defendant has the right to inspect before he or she makes a motion to challenge the jury-selection procedures under § 1867(a); defendant need only allege that he is preparing such motion), cited with approval in Royal, 100 F.3d at 1025. Thus, the seven-day filing requirement, like the sworn statement requirement at issue in Royal, did not apply to defendants' request for time to study the jury records.

This, however, does not end the matter. Defendants' principal argument here is that the district court did not afford them sufficient time to obtain and review the jury selection material. The "unqualified" right of access to such material, defendants contend, would be meaningless without a reasonable time to inspect the material.

-14-

Although the point is a good one in principle, it fails on the facts here. Rodriguez-Cabrera's attorney plainly was aware of the English proficiency question, as the trial court found, before he appeared in the case on December 14, 1998. Counsel nonetheless waited over one month to file the initial inspection motion. The only ground defendant was then raising was foreclosed by specific precedent. The English proficiency requirement had been rejected by this court in Flores-Rivera, supra. While defendants theoretically could have discovered another reason for challenging the jury, they still, despite the abundant amount of time they now have had, present no reason for attacking the jury selection process. And so defendants cannot prevail.[4]

3. Pre-Trial Publicity

The defendants also argue that the district court erred in not granting their motion for a continuance based upon adverse pre-trial publicity. There was intense media coverage of the arrest and indictment; by defendants count there were 153 articles in seven

---

[4] Further, the remedy for denial of access would be a remand with instructions to permit defendant sufficient time to inspect the relevant records. See Royal, 100 F.3d at 1025-26 (error in denying access to jury selection records did not require reversal of defendant's conviction but rather a remand for an opportunity to inspect those records; if, on remand, defendant then found a basis on which to mount a challenge to the jury, he could file a motion for a new trial).

newspapers on the topic in the 60 days after their arrest, and numerous broadcast accounts.  In fact, the district court issued a gag order on January 5, 1999, in an attempt at control.  The coverage then abated.

In the end, there is little merit to this claim.  In deciding whether to grant such a motion, the court must determine if prejudice exists from the publicity.  See United States v. Moreno-Morales, 815 F.2d 725, 733-34 (1st Cir.), cert. denied, 484 U.S. 966 (1987).  It is not enough for a defendant simply to claim that the jurors were exposed to news accounts of the crime.  See United States v. Medina, 761 F.2d 12, 18-19 (1st Cir. 1985).  Instead, a defendant "must show that the setting of the trial was inherently prejudicial."  Id. (quoting Murphy v. Florida, 421 U.S. 794, 803 (1975) (on change of venue)).  Prejudice may be presumed where inflammatory publicity has so saturated a community as to render it difficult to draw an impartial jury or where enough jurors admit to prejudice to cause concern as to any avowals of impartiality by the other jurors.  See United States v. Rodriguez-Cardona, 924 F.2d 1148, 1158 (1st Cir.), cert. denied, 502 U.S. 809 (1991).  In this case, the court determined that, although there was substantial publicity surrounding the trial, there was nothing particularly inflammatory about it, and that the coverage "r[an] the gamut from maligning to championing to defending to praising to simply reporting on the [d]efendant's situation."  In their brief to this

court, the defendants provide no citations to any evidence that the pre-trial publicity was particularly inflammatory or prejudicial.

Nor did voir dire reveal bias. The defendants argue that the district court erred in failing to individually voir dire each prospective juror outside the presence of other jurors regarding his or her exposure to pre-trial publicity and the effect, if any, of such exposure. "In cases where there is, in the opinion of the court, a significant possibility that jurors have been exposed to potentially prejudicial material . . . the court should proceed to examine each prospective juror apart from other jurors and prospective jurors." Patriarca v. United States, 402 F.2d 314, 318 (1st Cir. 1968) (emphases added), cert. denied, 393 U.S. 1022 (1969). At voir dire, however, the district court asked whether anyone had seen or read anything about the case. The court then questioned each prospective juror who had answered affirmatively concerning the circumstances under which he or she had been exposed to publicity and whether, despite this exposure, the individual could put his or her knowledge about the case aside and decide the case only on the evidence presented. The district judge then excused several jurors following such questioning. Defendants do not specify anything that the court missed or failed to inquire about during these exchanges. "The trial court has broad discretion in its conduct of the voir dire because the determination of impartiality . .

-17-

. is particularly within the province of the trial judge." Medina, 761 F.2d at 20 (internal quotation marks and citations omitted).

Further, as the district court noted, the defendants had failed to move for a change of venue, placing on them "a significantly heavier burden to show that widespread community publicity . . . render[s] their] trial presumptively unfair." Moreno-Morales, 815 F.2d at 739. This court has specifically noted that requesting a change of venue "remains a feasible option for a Puerto Rico accused confronted with publicity at home." Id. at 737. The district court also correctly pointed out that Rodriguez-Cabrera was coming up for re-election in November of 2000 and, so, it was unlikely that postponing trial would have resulted in diminished press coverage. Cf. id. ("Application for a continuance rather than a change of venue is particularly disfavored where . . . there is little reason to believe that the prejudicial publicity complained of will abate within a foreseeable period.")

Charges of corruption by high public figures inherently generate considerable public attention and notice. This court has affirmed denials of motions to change venue or postpone trial due to pre-trial publicity in cases involving much more high-profile, sensational criminal activity. See, e.g., United States v. Angiulo, 897 F.2d 1169, 1180-83 (1st Cir. 1990) (involving multi-defendant RICO trial of leading Boston organized crime figures); Moreno-Morales, 815 F.2d at 729-31 (involving police shooting of two supporters of Puerto Rican

independence and allegations in the press and at televised hearings before Puerto Rico's senate that the police officers had murdered the activists after they had been captured and fully subdued).  Other courts of appeals have done the same.  See, e.g., United States v. Maldonado-Rivera, 922 F.2d 934, 966-67 (2d Cir. 1990)(involving $7 million Brinks robbery by Puerto Rican independence group "Los Macheteros," or "the machete wielders"), cert. denied, 501 U.S. 1233 (1991).

4. District Court's Determination of Jurors' Understanding of English.

Defendants argue that the district court failed to adequately probe whether the prospective jurors sufficiently understood English. Their primary contentions are that the district court should have: (1) used the questionnaire propounded by defendants; and (2) asked the prospective jurors, in Spanish, not English, whether they had any problems understanding the proceedings.[5]

---

[5]   Rule 24(a), Fed. R. Crim. P. provides that the district court "may permit the defendant or the defendant's attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination."  In the latter case, the court shall allow the defendant or his attorney and the attorney for the government to supplement the questions posed by the court, or it "shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."  Id.

"Because voir dire determinations rely largely on . . . immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire." United States v. Brown, 938 F.2d 1482, 1485 (1st Cir.) (internal quotation marks omitted), cert. denied, 502 U.S. 992 (1991). Such discretion is "subject only to the essential demands of fairness." Real v. Hogan, 828 F.2d 58, 62 (1st Cir. 1987). Thus, a district court:

> need not permit counsel to dominate the process, nor pose every voir dire question requested by a litigant. It is more than enough if the court covers the substance of the appropriate areas of concern by framing its own questions in its own words.

Id.

Defendants had requested that the district court submit to the prospective jurors a questionnaire concerning proficiency in English. According to defendants, the district court denied this request but stated that it would incorporate into its voir dire the questions it deemed useful and pertinent. The voir dire examination, however, did not include any questions concerning English language ability.

Defendants then asked the trial judge to inquire, in Spanish, whether anyone was having problems understanding either the judge's questions or his instructions. The judge replied that the language of the court was English and that he already had addressed the issue in writing. The judge nonetheless asked, in English, whether anyone had had difficulty in understanding English during the session. One person

answered affirmatively and he was excused.  When defendants again requested that the question be posed in Spanish, the judge refused and responded that "[t]he jury plan in this district has taken care of th[e] situation."

Defendants rely on Thornburg v. United States, 574 F.2d 33 (1st Cir. 1978).  The defendant there had been convicted in the federal district court in Puerto Rico of drug-related offenses.  He then filed a § 2255 motion, claiming that at least one, and maybe as many as four, jurors had been unable to understand English.  See id. at 34.  One juror previously had been disqualified from jury service due to poor English and two other jurors had indicated on the juror qualification forms that they had little ability to read, write, speak, and understand English.  See id. at 34-35.  Here, in contrast, defendants do not point to any evidence that any juror's ability to understand English was deficient.

The district court did not abuse its discretion in the manner in which it conducted the voir dire.

5. Denial of the Motion to Suppress the Seized $12,000

Rodriguez-Cabrera moved, inter alia, to suppress the money seized from his desk at the time of his arrest.  After holding a suppression

hearing, the district court denied this prong of the motion.[6] Our review of the district court's ultimate conclusion concerning the suppression decision is de novo. See Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Andrade, 94 F.3d 9, 12 (1st Cir. 1996).

The problem raised is this. The agent only knew of the location of the money because he asked Rodriguez-Cabrera where it was, but Rodriguez-Cabrera had not been given Miranda warnings before being asked that question. Rodriguez-Cabrera thus argues the consensual search that resulted in the discovery of the money was the "fruit of a poisonous tree" -- the poisonous tree being Rodriguez-Cabrera's statement elicited in violation of the Fifth Amendment -- and should therefore have been suppressed. Whether or not the district court erred in admitting the evidence is not an important issue in the case, as the admission of the money, assuming dubitante there was error at all, was harmless beyond a reasonable doubt. First, the actual bundle of cash added little to the government's very strong case. Second, the defense theory of the case was that Shavers was the one behind the scheme. As to the money that changed hands, the defendants testified that it was for payment to one of the local contractors who had done

_____

[6] The district court, however, suppressed evidence of Rodriguez-Cabrera's gesture toward the desk drawer due to the failure to give Miranda warnings.

-22-

some work.  Thus, the $12,000 dollars in Rodriguez-Cabrera's desk was entirely consistent with the defense theory.

6.  Admission of Evidence of Rodriguez-Cabrera's Prior Bad Acts

Rodriguez-Cabrera argues that the district court abused its discretion in admitting evidence of his prior bad acts -- specifically, evidence that he had previously demanded a sum of money and a per-tire royalty in exchange for awarding a municipal tire removal contract. Specifically, defendant conceded the evidence was admissible under Rule 404(b), Fed. R. Evid., but argues the court improperly balanced the evidence under Rule 403, Fed. R. Evid. We review a district court's decision to admit or exclude evidence for abuse of discretion. See United States v. Gilbert, 181 F.3d 152, 160 (1st Cir. 1999).

The judge heard the government's proffer of the prior bad acts evidence and deferred ruling after Rodriguez-Cabrera testified, denying any attempt at extortion and saying that the transaction was innocent. The court ultimately decided the testimony was admissible to prove Rodriguez-Cabrera's intent and lack of mistake. The issue of intent was thus before the jury. The district court also instructed the jury that it could consider this evidence only for the limited purpose of whether Rodriguez-Cabrera had the state of mind or intent to commit the crime. The district court acted well within its discretion in

admitting the evidence. See Gilbert, 181 F.3d at 160-61; see also United States v. Aguilar-Aranceta, 58 F.3d 796, 798 (1st Cir. 1995).

Orlando-Figueroa also complains of spillover effect on him from this evidence. But the judge's instructions to the jury made clear that the evidence was only being offered as to Rodriguez-Cabrera for the limited purpose of deciding whether Rodriguez-Cabrera had the state of mind or intent necessary to commit the crimes. There was no error.

7. Excluding Shavers' Stale Conviction

The defendants argue that the district court abused its discretion by excluding evidence of Shavers' more-than-ten-year-old conviction in 1986 for mail fraud,[7] a crime involving "dishonesty or false statement" under Rule 609(a)(2), Fed. R. Evid. Under Rule 609(b), evidence of such a conviction is not admissible unless the court determines "in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." After two in-chambers hearings, the district court concluded that the probative value of the impeachment evidence did not substantially outweigh its prejudicial effect.

---

[7] Shavers had pled guilty to mail fraud as a result of his participation in the preparation and submission of false financial statements to a bank to obtain a loan for a client of his manufacturing company.

While Rule 609, Fed. R. Evid. is primarily concerned with potential unfairness to a defendant when his prior convictions are offered, the 1990 Amendment to Rule 609(a) rejects the approach that the rule does not also protect government witnesses. This is a case in which the defense did put into dispute the behavior of the government witness. A component of the defense was that the government had gone after the wrong defendant -- that Shavers was the culprit. While this increased the value of the 1986 conviction to the defense, it also increased its prejudicial effect. The ruling was within the court's discretion. While Shavers was a key witness, the case did not turn on Shavers' testimony alone. In addition to the tapes of the defendants' own words, at least three other witnesses corroborated Shavers' account of the events. These included Crawford, an FBI agent who had attended the Mississippi meeting with Shavers and Orlando-Figueroa, and a cooperating witness who had pled guilty. The defense's purpose in using the mail fraud conviction could well have been not so much to show that Shavers' testimony was untrue but rather to use the evidence as propensity evidence and thereby show that Shavers was just as criminally culpable as the defendants.

Moreover, the defense was able to impeach Shavers' credibility with more recent dishonest acts by Shavers. For example, defendants were able to suggest through cross-examination that Shavers initially was willing to engage in "wheeling and dealing" for his benefit and

only went to the FBI once he was "confronted with the magnitude of the corrupt solicitation and extortion." Defendants also presented evidence that Shavers had more recently been under investigation for paying off a Louisiana official in connection with a debris collection contract. That is a more factually similar situation to this case than the 1986 mail fraud conviction, and was used to attack Shavers' credibility. While a judge could also have concluded that the mail fraud conviction was admissible, there was no abuse of discretion in the district court's balancing.

8. Allowing the Government to Recall A Witness for Rebuttal

Defendants argue that the district court abused its discretion by allowing the government to recall a witness for rebuttal after it had concluded its case in chief. Orlando-Figueroa testified for the defense that on November 24, 1998, the day he was arrested, he was going to meet with Marcos Reyes-Gonzalez in order to pay him (for debris cleanup work he had performed) the $12,000 that was found in Rodriguez-Cabrera's desk.

Reyes-Gonzalez was a cooperating government witness who had pled guilty to charges related to his involvement in the scheme. He testified during the government's case-in-chief regarding events that took place before the arrests on November 24. Then, upon hearing Orlando-Figueroa's testimony about the $12,000, the government sought

to recall Reyes-Gonzalez to testify that he was not expecting any money on November 24. The court allowed the testimony. This was proper rebuttal testimony, and the defendants do not argue otherwise on appeal. On rebuttal, Reyes-Gonzalez was also questioned, over objection, about statements Orlando-Figueroa made to him about the $2.5 million. Defendants argue that the judge should not have allowed the government to recall Reyes-Gonzalez at all, but the real issue is whether the portion of his testimony regarding the $2.5 million should have been allowed. The trial judge found that the government only learned of the post-arrest conversations regarding the $2.5 million as a result of preparing Reyes-Gonzalez to give his rebuttal testimony. The defendants argued that the government should have elicited this information from Reyes-Gonzalez in preparing him for direct examination and should have presented it to the jury on direct examination. Reyes-Gonzalez's direct testimony concerned the pre-arrest information, and the trial court credited the explanation that Reyes-Gonzalez never told the government at his pre-trial interviews that he had any post-arrest information. On cross-examination on rebuttal, Reyes-Gonzalez testified that he only recalled Orlando-Figueroa's post-arrest statements about the $2.5 million after reading a newspaper article about Orlando-Figueroa's testimony attempting to justify the $2.5 million.

Given the court's crediting of the government's explanation, there was no abuse of discretion in allowing the government to recall Reyes-Gonzalez to offer rebuttal testimony.

9.  Denial of the Motion for a New Trial

The defendants claim that the district court abused its discretion in denying the motion for a new trial based on newly discovered evidence, primarily an independent survey commissioned by Shavers that showed that the landfill contained approximately 285,160 cubic yards of debris and could accommodate up to 565,000 cubic yards of debris. According to the defendants, this shows that the $2.5 million was for a tipping fee of $5.00 per cubic yard of debris.  The survey had been sent to FEMA, but FEMA had not provided it to the prosecutors.  We review a trial court's denial of a motion for a new trial based on newly discovered evidence for abuse of discretion.  See United States v. Huddleston, 194 F.3d 214, 218 (1st Cir. 1999).  The district court assumed the survey was material, and found that this new evidence was unavailable and that defendants had been diligent.  The trial judge ruled, nonetheless, that defendants had not shown the new evidence "probably will result in an acquittal on retrial." Id.  There was no error.

The evidence at trial was that Orlando-Figueroa discussed with Shavers submitting inflated invoices that would show amounts between

800,000 and 1,000,000 cubic yards of debris. The new survey evidence, assuming arguendo its validity and accuracy, could not have justified the exorbitant amounts discussed by Orlando-Figueroa and Shavers. Also, the survey could not corroborate defendants' tipping fee argument since the tipping fee for the amount of debris that the survey estimated was in the site, 285,160 cubic yards, at the final contract rate of $6.00 per cubic yard, would have been at most $1.71 million, not $2.5 million.[8] And there was trial testimony, which the jury apparently believed, that there was never even close to 500,000 cubic yards of debris to be cleaned-up, regardless of how much the town dump could hold.

Defendants also point to a second new document, which shows that the "tub grinder" portion of the Mayor's emolument had been rented originally and not purchased. There is no reason to think any of this evidence would have made a difference. The remaining arguments for new trial as to other evidence are without merit.

10. Sentencing

---

[8] Moreover, the evidence was that debris had not yet been collected, the tipping fee had not yet been invoiced or even calculated, and that there was no legitimate basis for either Rodriguez-Cabrera or Orlando-Figueroa to receive cash payments on behalf of the municipality.

The defendants make a number of arguments related to sentencing.

A.   Calculation of Intended Loss Figure

First, they claim that calculating an increase to their base offense level based upon an intended loss of $2.5 million was error. See U.S.S.G. § 2F1.1.  Our review is for clear error.  See United States v. Rizzo, 121 F.3d 794, 798 (1st Cir. 1997).  Application Note 8 to § 2F1.1 provides that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."  An intended loss finding should be upheld "where there is good evidence of actual intent and some prospect of success." United States v. Robbio, 186 F.3d 37, 44 (1st Cir.) (internal quotation marks omitted), cert. denied, 120 S. Ct. 602 (1999).  There was ample evidence of defendants' actual intent to cause a loss.  The only remaining question is whether there was some prospect of success from defendants' fraudulent scheme.  Defendants argue that FEMA never would have paid that amount of money and so a loss of $2.5 million was not possible.

The argument is too broad and the cases on which defendants rely are distinguishable.  This is not a situation in which the fraud, if successful, could, for other reasons, have caused no loss. Cf. United States v. Khan, 969 F.2d 218, 220-22 (6th Cir. 1992).  Nor is it a situation in which the defendant mistakenly and unreasonably believes

-30-

that the amount he can get by insurance fraud is greater than an objectively determined maximum the insurer could have paid. Cf. United States v. Santiago, 977 F.2d 517, 525-26 (10th Cir. 1992). Nor is this a case in which the prosecution's theory of intended loss is economically irrational. Cf. United States v. Schneider, 930 F.2d 555, 558-59 (7th Cir. 1991). The rule this circuit has followed is that the intended loss determination made by the district court must be based on evidence of "some prospect of success." Robbio, 186 F.3d at 44. That standard was met here.

The evidence showed that the defendants were going to submit certified fraudulent dump truck tickets and landfill log entries and a fraudulent survey from a licensed surveyor hired to inflate to FEMA the amount of debris at the site. In light of the need for speed when providing disaster relief, FEMA traditionally relies on the goodwill and candor of local municipal officials, as embodied in such certifications, rather than perform its own independent surveys. It is more than a bit odd to have defendants, who obviously took steps to make their fraudulent scheme successful, argue that the scheme in fact had no prospect of success and so they must receive a lesser sentence. The Guidelines do not give a break to defendants whose greed, in retrospect, may have overreached their abilities. Nor do the Guidelines impose an obligation of perfect diligence on the government agency to avoid being defrauded.

-31-

B.   Enhancement for Perjury

Second, the defendants claim that their sentences should not have been enhanced for obstructing justice -- specifically, for committing perjury.  See U.S.S.G. § 3C1.1.  The judge identified three examples of the commission of perjury: (1) the denial of solicitation attempts; (2) the denial that anything of value was requested; and (3) Rodriguez-Cabrera's explanation for the presence of $12,000 in his desk drawer.  The judge relied on the tape recordings for the finding of perjury.  On the evidence, the judge could clearly find that Rodriguez-Cabrera and Orlando-Figueroa lied in their testimony.

C.   Aberrant Behavior

Third, Rodriguez-Cabrera claims that he was entitled to a downward departure based on "aberrant behavior."  Except where the district court misunderstands its authority to grant the departure, "a criminal defendant cannot ground an appeal on a sentencing court's discretionary decision not to depart below the guideline sentencing range."  Robbio, 186 F.3d at 44 (internal quotation marks omitted).  Nothing suggests that the district court did not understand its legal authority to depart downward.

Defendants' Eighth Amendment argument as to sentencing is frivolous.

**III.**

To the extent defendants make other arguments, such arguments are without merit.

The convictions and sentence are affirmed.

<u>So ordered.</u>