UNITED STATES of America, Appellee,

v.

Gilbert TORRES, Defendant, Appellant.

No. 85–1208.

United States Court of Appeals,
First Circuit.

Argued May 5, 1986.

Decided June 19, 1986.

Robert R. Berluti, Boston, Mass., by Appointment of the Court, for appellant.

Joseph F. Savage, Jr., Sp. Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., Boston, Mass. was on brief, for appellee.

Before COFFIN and BOWNES, Circuit Judges, and MALETZ,* Senior Judge.

MALETZ, Senior Judge.

In a three-count superseding indictment returned on November 28, 1984, Gilbert Torres was charged with two counts of possession of cocaine with intent to distribute and distribution of cocaine, 21 U.S.C. § 841(a)(1) (1982), and with one count of assaulting, resisting, and interfering with federal officers in the performance of their official duties by use of a deadly and dangerous weapon, 18 U.S.C. § 111 (1982).[1] On January 28, 1985, Torres pleaded guilty to counts 1 and 2—the cocaine charges. Torres went to trial on the assault charge of count 3 on February 12, 1985, and the jury returned a guilty verdict later that day.

Ten days later, the district court sentenced Torres to concurrent four-year prison terms and concurrent three-year special parole terms on the narcotics counts. Additionally, Torres was sentenced to two years' imprisonment on count 3, consecutive to the concurrent sentences on counts 1 and 2. In this appeal, Torres challenges the judgment of conviction entered on count 3, arguing that the district court violated his sixth amendment rights by failing to grant a continuance and his right to a fair trial by limiting the interpreter's translation of certain statements. For the reasons that follow, we find Torres' contentions without merit and therefore affirm.

## I. Background

### A. The Drug Transaction

On November 9, 1984, in Brockton, Massachusetts, Kathleen Bennett, a special agent of the Drug Enforcement Administration (DEA) working in an undercover capacity, met with Torres for the purpose of buying cocaine from him. When she gave a signal to Special Agents Herbert Lemon and Stephen Assarian, they sought to arrest Torres, who was at the wheel of his automobile. After the agents identified themselves, Torres put his vehicle in drive and chased Assarian, eventually striking him. Assarian discharged his revolver, hitting Torres and thus causing him to stop his car.

---

* Of the United States Court of International Trade, sitting by designation.

1. Section 111 provides:
   Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.
       Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
   Officers and employees of the Drug Enforcement Administration are among those designated in 18 U.S.C. § 1114 (Supp. II 1984).

## B. *The Trial*

### 1. *Sixth Amendment Rights*

Torres, a native Mexican, speaks Spanish but not English. The court found Torres indigent and on November 15, 1984, two days after the initial arraignment, appointed Attorney Raymond Gillespie to represent him. On November 30, Torres pleaded not guilty to all counts of the superseding indictment, but on January 28, 1985 he changed his plea to guilty on the two narcotics counts. During the January 28 allocution, the district court inquired into Torres' satisfaction with his representation by Gillespie:[2]

> THE COURT: Mr. Torres, are you satisfied with the legal services that you have received from Attorney Gillespie in connection with this case?
>
> MR. TORRES: Yes.
>
> THE COURT: Would you say he is a satisfactory lawyer, as far as you are concerned?
>
> MR. TORRES: Yes.
>
> THE COURT: Any complaints about him?
>
> MR. TORRES: No.

After accepting the guilty plea on counts 1 and 2, the court set trial on count 3 for February 12 and continued bail.

Three days before trial, Torres advised Gillespie that he wanted to retain private counsel. On February 12, the morning of the trial, Gillespie, at Torres' request, moved to withdraw. The district court, which had received no prior indication that Torres wanted to replace Gillespie, inquired into the reasons for Torres' dissatisfaction with his attorney. Torres alleged that there was a "conflict of interest" because he had not received an adequate explanation of the case and Gillespie had not fought for his rights by securing the release of his personal belongings.[3] In his brief, Torres characterizes Gillespie's application as more than a motion to withdraw. Thus, the brief states: "Concommitant [*sic*] with the motion to withdraw was Torres' motion (stated or implied) for a continuance to try the case at a later date with new counsel." However, our review of the record does not reveal—and Torres does not point out—a *stated* motion for a continuance.[4]

After Torres listed his reasons for wanting to dismiss his attorney, Gillespie indicated to the court that he had met with Torres on at least five separate occasions; spent approximately eight hours conferring with him; filed pretrial motions; hired a private investigator; obtained a transcript from a pretrial hearing; and obtained all grand jury minutes and discovery from the government.

The district court, after finding no conflict of interest and denying the motion to withdraw, offered Torres the option of proceeding with Gillespie as his attorney or of proceeding pro se. The court told Torres that it was in his best interest to have a lawyer[5] and added that, in the event Torres chose to proceed pro se, Gillespie would be ordered "to be here in case you change your mind and want to ask him legal questions."

Among its preliminary remarks to the prospective jurors, the court stated:

---

2. Mr. Torres spoke through an interpreter.

3. In his brief, Torres states that if he had had the opportunity, he would have also told the court that he desired Spanish-speaking counsel and had contacted two prospective attorneys. As we read the record, Torres was not precluded from telling this to the district court rather than mentioning it for the first time on appeal.

4. At most, the district court told Torres at the beginning of the recorded proceedings that it would not "accept your firing of [Gillespie] at the last minute as a basis for delaying this trial."

5. "Although the practice of issuing specific warnings to defendants who wish to proceed pro se is a good way—perhaps the best way—to insure that the requirements of *Faretta* [*v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)] are met, it is not the *only* way." *United States v. Hafen*, 726 F.2d 21, 26 (1st Cir.) (emphasis in original), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984). Torres does not complain that he received inadequate warning of the hazards of self-representation.

I am not sure from talking to Mr. Torres and Mr. Gillespie whether Mr. Torres will represent himself or use the services of Mr. Gillespie who has been his attorney up until today. In any event, I have arranged to have Mr. Gillespie available to Mr. Torres during the entire trial, and the estimate of the lawyers is that we will finish this trial either today or tomorrow morning.

Torres objects to the following statement of the court, made shortly thereafter as jury selection continued:

Mr. Torres, as I said earlier, is the gentleman at the rear counsel table in a leather jacket. He is represented by Attorney Gillespie, who is seated beside him.

At trial, Special Agents Lemon, Assarian, and Joseph Ritucci were the only government witnesses; Torres was the only defense witness. While Gillespie made one objection and attended all bench conferences, Torres exercised his right to a peremptory challenge during jury selection; delivered an opening statement; cross examined government witnesses; testified in his own defense; and delivered a closing argument.

2. *Interpretation of Remarks by Torres*

During his cross examination of the DEA agents, Torres twice ventured beyond asking questions and instead made statements. On these occasions, the district court instructed the interpreter not to translate Torres' statements. The first such instance occurred during the testimony of the government's first witness, Agent Lemon:

Q. But he said that the door was open—

MR. SAVAGE [Assistant United States Attorney]: Objection.

Q. —and I say that it was closed.

MR. SAVAGE: Objection to the statements.

THE COURT: Miss Interpreter, he is there to ask questions, not to make statements, so don't translate any affirmative representations he makes as to the facts.

He will have a chance to testify if he wants to exercise that right.

THE DEFENDANT: All right.

THE COURT: He is only to question this man about this man's testimony. That's where he is at now.

THE DEFENDANT: No questions then.

THE COURT: You're excused, sir.

As the transcript demonstrates, Torres asked no questions of Agent Lemon after the court's instructions to the interpreter. The second instance took place during Torres' cross examination of the government's second witness, Agent Ritucci:

Q. When he left his car, when he turned around, when I stopped my car, when I was hit, it is then when he started—

THE COURT: No, no. Only questions, Miss Easman [the interpreter], if he wants to ask him a question, but he's not going to make a statement.

MR. SAVAGE: Objection.

THE DEFENDANT: No problem then.

THE COURT: You're discussing then.

THE DEFENDANT: It's that he's lying a lot.

THE COURT: I'll instruct the jury to disregard that. Miss Easman, please do not translate these can [sic] statements. He is only entitled at this stage of the game to make comments, not make statements.

THE INTERPRETER: When the defendant starts to speak, I don't know if it is a question or a statement. I don't have any way of knowing.

THE COURT: Wait until you hear the end of it. Don't start translating until you know it's a question or a statement. When the government's putting in its case, he's entitled to ask him questions on it, but not make statements. If he wants to take the statement and make the statement when the government is finished, he can do it.

THE INTERPRETER: Your Honor, may I wait until he finishes, then you will instruct me if I should state it?

THE COURT: If you can't tell whether it's a question or a statement, then come up here and I will instruct you.

Following this colloquy, there was a discussion off the record; immediately thereafter, the government called its final witness, Agent Assarian, whom Torres did not cross examine. Thus, as far as the record before us indicates, Torres had no further questions of Agent Ritucci—or of any other witness—after the district court's second instruction to the interpreter not to translate the defendant's affirmative representations.

## II. *Sixth Amendment Issues*

### A. *Denial of a Continuance*

■ Torres contends that the district court abused its discretion in not granting a continuance of the trial so that he could obtain counsel of his choice. The Supreme Court has stated: "[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)). In deciding whether denial of a continuance constitutes an abuse of discretion, we cannot apply a mechanical test, but must evaluate each case on its own facts. *United States v. Poulack,* 556 F.2d 83, 86 (1st Cir.), *cert. denied,* 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977). *Cf. United States v. Hill,* 526 F.2d 1019, 1022 (10th Cir.1975) (discretionary denial of continuance will not be disturbed without clear showing of abuse causing manifest injustice), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976). In reviewing the district court's exercise of discretion, we must pay particular attention to "the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite,* 376 U.S. at 589, 84 S.Ct. at 849.

Here, the crucial fact is that no reasons were presented to the trial judge, inasmuch as there was no explicit request for a continuance. On the morning of trial, Torres attempted to dismiss Attorney Gillespie, and Gillespie filed a written motion for leave to withdraw his appearance. Torres did not ask for time to obtain another attorney. Nor did Gillespie, who acted as standby counsel during the trial, request a continuance. Since Torres' only request on the record was for substitution of counsel, while his appellate contention is that a continuance should have been granted, our analysis of the two issues is necessarily conflated.

In examining the reasons for Torres' dissatisfaction with Gillespie, the district court anticipated our holding in *United States v. Allen,* 789 F.2d 90, 92, (1st Cir. 1986):

When the accused voices objections to appointed counsel, the trial court should inquire into the reasons for the dissatisfaction.... In this case, the district court performed such an inquiry and determined that good cause did not exist for the substitution of counsel. In evaluating whether a trial court's denial of motion for continuance or substitution of counsel constituted an abuse of discretion ..., the appellate court should consider several factors, including the timeliness of the motion, the adequacy of the court's inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense.... [Citations omitted.]

Under *Allen,* the district court was entirely justified in finding that Torres lacked good cause for the eleventh-hour dismissal of Gillespie. The record demonstrates that Gillespie acted diligently and competently, as Torres implicitly acknowledged by stating his satisfaction with Gillespie on the occasion of the guilty plea to the cocaine charges entered fifteen days before trial on the assault charge. Although Torres might not have considered Gillespie the ideal attorney, he was certainly more than adequate, and the district court did not abuse its discretion in so finding.

Thus, even had there been an explicit request for a continuance, denial of that motion would have been within the permissible range of the district court's discretion, because:

The right to counsel may not be manipulated in a cat and mouse game with the court.... Whether the attorney is deemed satisfactory or not, the court, at some point, may require the defendant to go to trial.

*United States v. Rodriguez Vallejo*, 496 F.2d 960, 965 (1st Cir.) (citation omitted), *cert. denied*, 419 U.S. 965, 95 S.Ct. 226, 42 L.Ed.2d 179 (1974); *accord, e.g., United States v. Mastroianni*, 749 F.2d 900, 914 (1st Cir. 1984) (defendant's right is "to effective counsel, not to counsel of his choice at any cost in terms of delay"); *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976) (court need not tolerate unwarranted delays and may require defendant to go to trial even if he is not entirely satisfied with his attorney).

### B. *Use of Standby Counsel*

■ It is Torres' further contention that the district court denied him his right to self-representation by forcing Gillespie upon him and, indeed, by introducing Gillespie to prospective jurors as the attorney representing Torres. Torres relies on *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), which held that there is a constitutional right to self-representation. In particular, Torres emphasizes the following passage:

An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense.

*Id.* at 821, 95 S.Ct. at 2534 (emphasis in original).

Torres does not call to our attention the following statement in *Faretta:*

Of course, a State may—even over objection by the accused—appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.

*Id.* at 835 n. 46, 95 S.Ct. at 2541 n. 46.

Instead, Torres relies on *Wilson v. Mintzes*, 761 F.2d 275 (6th Cir.1985), in which the court held that the habeas corpus petitioner was the victim of ineffective assistance of counsel because the trial judge refused to heed his expressions of dissatisfaction with his attorney. *Wilson*, however, is readily distinguishable, in that it involved open animosity between the trial judge and defense counsel, expressed in the presence of the jury, which led to counsel's refusal to serve and the abandonment of his client's defense. Here, Gillespie did not refuse to act as counsel; Torres refused to permit him to act as counsel. Thus, *Wilson* is inapposite in the context of Torres' claim that Gillespie was forced upon him as standby counsel.

For its part, the government demonstrates that use of standby counsel has been accepted in this circuit, citing *Maynard v. Meachum*, 545 F.2d 273, 277 (1st Cir.1976), and *United States v. Hafen*, 726 F.2d 21, 25 (1st Cir.), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984). Though helpful, the cases tell us merely that a "hybrid arrangement" including standby counsel is permissible, *see Maynard*, 545 F.2d at 277, without describing how much standby counsel can do before violating a defendant's *Faretta* rights.

Fortunately, our task is not so daunting, in light of the dispositive analytic framework provided by the controlling precedent of *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), which, inexplicably, was not cited by either party. *McKaskle* held that *Faretta* did not contemplate an absolute bar on unsolicited participation by standby counsel. *Id.* at 176, 104 S.Ct. at 950. Instead, the Court read *Faretta* as posing the question of whether or not "the defendant had a fair chance to present his case in his own way." *Id.* at

177, 104 S.Ct. at 950. Toward that end, *McKaskle* formulated a two-part test:

First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.

Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.

*Id.* at 178, 104 S.Ct. at 951 (emphasis in original) (footnote omitted).

Against this background, we may analyze whether Gillespie's activities at trial deprived Torres of his *Faretta* rights. Significantly, the district court placed no limit on Torres' right to make peremptory challenges, to deliver an opening statement and closing argument, to testify in his own behalf, and to cross examine government witnesses. Gillespie's presence was hardly intrusive; his assistance at bench conferences benefited Torres without depriving him of the opportunity to present his own defense [6] or conveying to the jury an impression that Torres was not representing himself.[7]

While it is true that, during jury selection, the district court inaccurately described Gillespie as the attorney for Torres, this isolated statement, in the context of other statements indicating that Torres was acting as his own lawyer, did not violate *Faretta*. We note that this misstatement, which resulted from the court's practice of identifying persons at counsel table to the prospective jurors, was followed by several occurrences that made Torres' self-representation utterly clear to the jury.[8] Thus, both portions of the *McKaskle* test have been satisfied and Torres' right to represent himself was preserved.

### III. *Limits on Interpretation*

Torres' final assignment of error is his argument that the district court erred in barring the interpreter from translating statements made by the defendant during his cross examination of government wit-

---

**6.** *McKaskle* teaches that *Faretta* is not infringed when standby counsel assists the defendant in overcoming routine procedural or evidentiary obstacles, or helps to ensure compliance with basic rules of courtroom protocol and procedure. 465 U.S. at 183, 104 S.Ct. at 953.

**7.** Our reading of the record shows only the following instances in which Gillespie spoke before the prospective jurors or the empanelled jury:

(1) Before jury selection began, he requested a bench conference with Torres present.
(2) He said "Thank you" after prospective jurors were called into the jury box.
(3) He responded affirmatively when the court inquired whether he wished Torres to be present at a bench conference during jury selection.
(4) Immediately prior to swearing of the jury, he stated he was satisfied with the panel, as to which Torres had exercised his right to peremptory challenges.
(5) After the government's opening statement, in response to an inquiry from the court, he stated he would not make an opening but Torres might wish to.

(6) He asked the court to change the position of Agent Lemon so that a blackboard would be visible during Lemon's testimony.
(7) He requested a bench conference, at which erasures on the blackboard were discussed.
(8) He objected when the government asked Agent Ritucci to estimate the speed of Torres' vehicle.
(9) He requested a bench conference, at which admission of a hospital record was discussed.

This very limited participation in the jury's presence could not possibly create the mistaken impression that Torres was not representing himself.

**8.** Following the government's opening statement, the court inquired of Gillespie whether he or Torres wished to make an opening. Gillespie whether he or Torres wished to make an opening. Gillespie answered, in the presence of the jury, that he would not make an opening statement, but that Torres might. Torres answered "Yes" and proceeded to make a statement. Thereafter, Torres continued to act as his own attorney, and the jury could not have received any mistaken impression on that point.

nesses. While we agree with Torres that the court should not have restricted interpretation, we conclude that the error was harmless beyond a reasonable doubt.

We have been unable to locate a precedent directly on point, but we are satisfied that the interpreter's duty is to translate all statements, without restriction by the court. The legislative history to the Court Interpreters Act, 28 U.S.C. §§ 1827–1828 (1982), demonstrates that Congress contemplated full translation by interpreters. The report of the House Judiciary Committee indicates an intent "that all interpretations are to be made in the consecutive mode except in those limited situations where the court determines, *and all the parties agree,* that the simultaneous or summary mode will aid in the efficient administration of justice." H.R.Rep. No. 1687, 95th Cong., 2d Sess. 7–8, *reprinted in* 1978 U.S. Code Cong. & Ad.News 4652, 4658 (emphasis added).[9] The report continued: "The committee anticipates that the summary mode of translation will be used very sparingly." *Id.* at 8, *reprinted in* 1978 U.S. Code Cong. & Ad.News at 4659.

In effect, the district court directed the interpreter to use the summary mode of translation without obtaining the consent of all parties. This direction did not comport with congressional intent or with fundamental conceptions of the interpreter's role in a criminal trial. *See United States ex rel. Negron v. New York,* 434 F.2d 386, 388–90 (2d Cir.1970) (spasmodic interpretation and ex post facto résumés of English testimony deprived Spanish-speaking defendant of constitutionally guaranteed ability to understand precise nature of testimony against him); *accord United States v. Carrion,* 488 F.2d 12 (1st Cir.1973) (per curiam), *cert. denied,* 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974); *cf. United States v. Anguloa,* 598 F.2d 1182, 1184 (9th Cir.1979) (prosecutor's ex parte replacement of interpreter was improper).[10]

■ Although interpretation of Torres' statements should not have been limited, the error was indisputably harmless. The record demonstrates that the court instructed the interpreter twice. The first instance was after she translated an objectionable statement; immediately after the instruction, Torres ceased to examine the first government witness. On the second occasion, the interpreter stated her inability to know in advance whether a statement would be objectionable, thus indicating that she had not been curtailing her translation in the interim. The court then instructed the interpreter to approach the bench when she was in doubt; immediately after this instruction, Torres ceased to examine the government witness then on the stand, and he did not cross examine the final government witness. Thus, every statement Torres made was translated, notwithstanding the court's instructions to the interpreter, and the error is therefore harmless.[11]

## IV. *Conclusion*

We have considered all the arguments advanced by Torres and find them without merit. Accordingly, the judgment of the district court is

*Affirmed.*

---

**9.** The report defines summary translation as allowing the interpreter to condense and distill the speech. H.R.Rep. No. 1687, 95th Cong., 2d Sess. 8, *reprinted in* 1978 U.S.Code Cong. & Ad.News 4652, 4659.

**10.** We recognize that the cited cases implicate the defendant's right to understand the charges against him and to confront his accusers rather than the right to have his statements translated, but the tenor of the cases suggests that the interpreter should serve a computer-like function in enabling the defendant to understand and to be understood, without discretion to limit translation to those statements deemed appropriate by the court or the government.

**11.** Of course, we do not mean to suggest that a trial court should be rendered impotent in the face of continuous misconduct by a pro se defendant. "[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 835 n. 46; *accord McKaskle,* 465 U.S. at 183–84, 104 S.Ct. at 953–54.