# United States Court of Appeals

## For the First Circuit

Volume II of II

No. 01-1647

UNITED STATES OF AMERICA,

Appellee,

v.

José Rodriguez-Marrero,

Defendant, Appellant.

No. 02-1462

UNITED STATES OF AMERICA,

Appellee,

v.

Omar F. Genao-Sanchez,

Defendant, Appellant.

No. 02-1707

UNITED STATES OF AMERICA,

Appellee,

v.

Luis Roldan-Cortes,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

---

Before

Selya, <u>Circuit Judge</u>,
Coffin, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

---

<u>Lydia Lizarribar-Masini</u> for appellant Omar Genao-Sanchez.
<u>Raymond L. Sanchez Maceira</u> on brief for appellant José Rodriguez-Marrero.
<u>Linda George</u> for appellant Luis Roldan-Cortes.
<u>Thomas F. Klumper</u>, Assistant United States Attorney, with whom <u>H.S. Garcia</u>, United States Attorney, and <u>Sonia I. Torres</u>, Assistant United States Attorney, were on brief for appellee.

---

November 5, 2004

---

## C.  Roldan's Claims

Roldan raises six claims on appeal: (1) the district court's denial of his continuance motion denied him the opportunity for a fair trial; (2) the evidence upon which he was convicted was insufficient and submitted to the jury upon an incorrect mens rea instruction; (3) the court should have severed his trial from his co-defendants'; (4) he deserves a new trial because of newly-discovered evidence and the government's Brady violation; (5) the court violated Apprendi and Blakely; and (6) the sentencing court failed to understand its authority to grant a downward departure. We consider each of these claims in turn.

## 1.  Denial of the Continuance Motion

Claiming that the fifty-six day time span between his arraignment and the start of the trial did not give his attorney adequate time to review the evidence and to prepare a defense, Roldan claims that the district court's denial of his motion for a thirty day continuance deprived him of due process and the effective assistance of counsel. He argues that this difficulty was exacerbated by the government's decision to seek the death penalty until the day before the trial. We grant "broad discretion" to a trial court to decide a continuance motion and will only find abuse of that discretion with a showing that the court exhibited an "unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay."

United States v. Rodriguez Cortes, 949 F.2d 532, 545 (1st Cir. 1991) (internal quotation marks omitted). "In deciding whether denial of a continuance constitutes an abuse of discretion, we cannot apply a mechanical test, but must evaluate each case on its own facts." United States v. Torres, 793 F.2d 436, 440 (1st Cir. 1986). Among the factors we evaluate in reviewing such a denial are "the defendant's diligence, the inconvenience to the court and other parties, the likely utility of a continuance, and any unfair prejudice caused by the denial." United States v. Orlando-Figueroa, 229 F.3d 33, 40 (1st Cir. 2000).

Roldan greatly increased the potential burden on the court and the government by failing to file a timely request for a continuance. In fact, having received the court's warning that the district court's backlog did not allow it to grant any continuances, Roldan did not file his motion for a thirty day continuance until the day before the trial was scheduled to begin. See United States v. Jones, 730 F.2d 593, 596 (10th Cir. 1984) (holding that the district court properly denied the motion for continuance because, inter alia, the defendant waited until six days before trial to file the motion); United States v. Lee, 729 F.2d 1142, 1144 (8th Cir. 1984) (per curiam) (the defendant's diligence in requesting a continuance in timely fashion is a factor in determining whether denial was appropriate); United States v. Bollin, 729 F.2d 1083 (6th Cir. 1984) (per curiam) (holding that

there was no error in the district court's denial of a motion for a continuance filed on the first day of a trial). There is no gainsaying the poor timing of Roldan's motion.

Importantly, with one exception that we discuss separately, Roldan fails to identify any specific ways in which the court's denial of his continuance motion unfairly prejudiced him.[10] A defendant is generally not entitled to a new trial unless he or she can identify specific ways in which the court's erroneous denial of a continuance prejudiced his or her defense. United States v. Flecha-Maldonado, 373 F.3d 170, 176 (1st Cir. 2004) (affirming trial court's denial of a continuance after observing that "counsel has identified no concrete ways in which the unusual trial schedule in this case prejudiced [the defendant]"). Although he states that the government produced twenty thousand pages of documents and tape recordings relating to thirty-five individuals, he fails to identify (with the one exception already noted) any material document that he was unable to review due to the time

---

[10]For example, Roldan argues in his brief as follows:

Defendant absolutely needed more time. Time to identify, locate and produce witnesses. Time to importune their cooperation, and secure their testimony. Time to review their words and follow-up with further investigation. Time to accomplish all of this while scrutinizing 20,000 pages of discovery accumulated over a 2 1/2 year period, reviewing voluminous taped evidence; within the shadow of the death penalty and all of its ramifications.

These are fervent claims, but they are also generalities.

-43-

pressures.  Furthermore, Roldan's complaint about twenty thousand pages of discovery is misleading.[11]  The government provided a contents page with each discovery package that it sent to the defendants.  Roldan could have used these indices to focus his evaluation of the evidence on the issues and witnesses that were relevant to his defense without having to sift through all of the pages in the documents.  The three murder-related charges were particularly suited to such a targeted approach.  They concerned a few individuals involved in a discrete set of events over a limited time period.

When Roldan finally filed the continuance motion,[12] it stated generally that "Mr. Roldan-Cortes is being charged in the second superseding [sic] returned July 16, 2000.  Defendant's attorney has not complied [sic] due to the reason that it is impossible with so many documents to analyze and the evidence that has been submitted to us by the government."  The arguments that Roldan presented orally at trial were similarly general.  On the first day of trial, his attorney, Efren Irizarry, announced:

> We would like to state our position that we are not ready for trial, our client voluntarily surrendered less than two months ago, and some of the things that co-counsel

---

[11]Roldan did not respond to the claim in the government's brief that the discovery provided was only approximately 4,500 pages.

[12]Roldan did not include his motion as part of the record on appeal; however, we requested and received a copy from the district court.

are mentioning here are totally new to me, due
to the reason that it's impossible for
ourselves to be reading the extensive
thousands of documents that the US attorney
has forwarded us, and we haven't been able to
hear only about half of the tape recordings
they have given us, and we were going to make
an opening statement regarding -- we don't
even know the totality of the discovery that
we asked the government, and what it related
to our client, and what doesn't, in a matter
that imposes a capital crime.

Later that day, Irizarry interjected: "Your Honor, for the record,

I would just like to reproduce my motion that I haven't been able

to review all of the evidence."  This statement prompted the court

to respond: "There is no need to further -- there is no need to

repeat the fact that you're not prepared a thousand times on this

record.  You made your point."  The court and Irizarry then had a

short exchange:

> COURT:       By the way, don't forget about the
>              fact, Ms. [sic] Irizarry, that you
>              had a conversation with me before
>              this trial started, in which you
>              wanted me to relieve you from
>              further representing this
>              individual because he had only
>              paid you $25,000.
> IRIZARRY:    No, Your Honor, $6,500.  I filed a
>              motion to it.
> COURT:       Because it was too little money
>              for you to sit in trial for two
>              months.[13]

Despite his repeated complaints that the attorneys of the

co-defendants had more time to prepare cases for their clients,

---

[13]As this exchange indicates, Roldan chose to have Irizzary
represent him; the attorney was not appointed by the court.

Irizarry's performance was comparable to that of the other attorneys.  Only one of the defendants presented an opening statement to the jury, and only one witness, a pathologist who provided expert testimony regarding Llaurador's remains, appeared for any of the defendants.  Irizzary was able to cross-examine the government's chief witnesses, Soto and Ramos, with earlier statements that they provided to the federal investigators and co-conspirators.  Further, although Roldan hired a new attorney to prosecute this appeal, the brief filed on appeal does not identify any specific deficiencies in Irizarry's performance or, as already stated, specific examples of prejudice (save one) caused by the denial of the continuance.[14]  See United States v. Moore, 362 F.3d 129, 136 (1st Cir. 2004) (observing that there was "ample opportunity" between the sentencing hearing and the appeal for the defendant to have reflected and identified specific prejudice from the court's denial of his continuance motion).

As a specific example of prejudice resulting from the denial of the continuance, Roldan cites his late discovery of a one page report from the Aguadilla Police Department discussing information from a confidential informant who implicated people

_____

[14]The attorney, Linda George, was actually hired after the trial but before sentencing.  She made her first appearance on March 22, 2002.

other than him in the shooting of Martin.[15]  Even though the government provided that one page report to him during discovery, he says that he failed to discover it in the mountain of produced documents.  Furthermore, he claims that his inability to find this document prevented him from contacting the Aguadilla police to try to obtain the supporting documentation for this one page report that may have been contained in their investigative file.

Roldan makes a <u>Brady</u> claim about this police report which we discuss in a later section of this opinion.  It is sufficient for our purposes here to note Roldan's lack of diligence in not locating this one page police report prior to trial in the discovery provided to him.  If he had simply glanced at the contents pages that accompanied the discovery packets, he would have seen a heading marked "Documents Relating to Murder of James Martin Rodriguez on May 20, 1993, are Listed as Numbers 195 to 215 Below," and then he would have seen an entry marked "208.  Copy of a report regarding confidential information received concerning 'Muerte occurrida en Res.' (1 p.)."  Moreover, even the timely discovery of this document by Roldan probably would not have produced anything helpful at trial.  Roldan's attorney noted at oral argument that even though she had been actively trying to obtain a copy of the investigative file from the Aguadilla Police

_____

[15]The confidential informant named four individuals involved in the shooting of Martin, none of whom were mentioned by Ramos in his account of the murder.

Department for the past two years, she has been unable to do so. This history underscores the absence of any prejudice in the denial of Roldan's motion for a thirty day continuance.[16]  It confirms, along with the other reasons cited, that the court's denial of Roldan's continuance motion did not amount to a manifest abuse of discretion.  See Orlando-Figueroa, 229 F.3d at 41 ("While the trial judge held defendants to a tough schedule, in the absence of a showing of unfair prejudice to defendants, there was no manifest abuse of discretion.").

## 2.  Sufficiency of the Evidence

Roldan claims that the government did not introduce sufficient evidence to convict him of aiding and abetting the murder of a government informant based on his role in assisting with Martin's murder.  More specifically, he claims that the government failed to demonstrate that he knew that he was aiding and abetting the murder of a federal government informant.  His argument proceeds in two parts: (1) the government did not prove that he knew that Pagan and Ramos were going to kill Martin; and (2) even if he did, he did not know that Martin was going to cooperate with federal authorities.

Roldan claims that the government proved that Pagan was going to communicate with Martin and that "[a]ny number of

---

[16]Roldan raises a further claim of prejudice concerning his inability to locate some exculpatory witnesses.  We discuss that claim when we evaluate Roldan's claim for a new trial.

communicative efforts were possible . . . from a slap on the wrist, to menacing, to the infliction of various wavelengths of pain or injury from a broad spectrum of possibilities, to murder." This argument is specious. Roldan was an active and experienced member of a drug smuggling ring when he helped to arrange Martin's murder because Martin had become a government informant. Ramos testified that Santodomingo told him that Roldan would instruct him regarding what he was supposed to do when he arrived at the Ducos housing project, and that Roldan identified Martin as the man whom Ramos and Pagan were supposed to murder. Ramos also testified that Pagan told him that Roldan gave him one-half of a kilo of cocaine as payment for the murder. The argument that no rational jury could have concluded that Roldan knew that Pagan was going to kill Martin after reviewing this evidence is untenable.

Roldan's claim that the government failed to establish the requisite federal nexus under the Witness Protection Act also lacks merit. He argues that the government failed to prove that Roldan aided and abetted Martin's murder with the belief that Martin might communicate with federal officials regarding the drug conspiracy. However, as we have already noted in our discussion of Rodriguez's similar claim, the Witness Protection Act explicitly relieves the government of having to prove that the defendant believed that the witness might contact federal officials regarding the federal crime. See 18 U.S.C. § 1512(g) (stating that "[i]n a

prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance . . . that the law enforcement officer is an officer or employee of the Federal Government"); United States v. Baldyga, 233 F.3d 674, 680-81 (1st Cir. 2000) ("We also want to dispel any notion that the defendant's intent to hinder communication must include an awareness of the possible involvement of federal officials."). The evidence demonstrates that Roldan aided and abetted Martin's murder because he was concerned that Martin might "snitch" about the organization's smuggling activities. As it turns out, Martin had, in fact, begun cooperating with the federal authorities. This evidence was sufficient to establish the federal nexus. See United States v. Bell, 113 F.3d 1345, 1349 (3d Cir. 1997) ("[T]he government must prove that at least one of the law-enforcement-officer communications which the defendant sought to prevent would have been with a federal officer, but . . . is not obligated to prove that the defendant knew or intended anything with respect to this federal involvement.").

Furthermore, we reject Roldan's claim that the court's instruction regarding the state of mind requirement for conviction under section 1512 was inconsistent or confusing. While failure to raise a timely objection to a jury instruction limits our review to plain error (there was no such objection here), see United States v. Sabetta, 373 F.3d 75, 80 (1st Cir. 2004), there was no error at

all in the jury instruction.  The court properly explained the requirements outlined by section 1512.

## 3. Severance

Citing the prejudicial impact of the gruesome details that were presented to the jury about the Caballo and Llaurador murders and the relatively minor role he played in the charged conspiracy, Roldan claims that the trial court erroneously denied his motion to sever his trial from that of his co-defendants.  "The decision to grant or deny a motion for severance is committed to the sound discretion of the trial court and we will reverse its refusal to sever only upon a finding of manifest abuse of discretion." United States v. Brandon, 17 F.3d 409, 440 (1st Cir. 1994); see also United States v. Searing, 984 F.2d 960, 965 (8th Cir. 1993) ("In the context of conspiracy, severance will rarely, if ever, be required.").

While Fed. R. Crim. P. 8(b) allows the government to charge multiple defendants in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses," a companion rule allows a court to order separate trials or to "provide any other relief that justice requires" if such joinder appears to prejudice a defendant or the government.  Fed. R. Crim. P. 14(a).  "Prejudice from joinder can come in various forms, including jury confusion, the impact of evidence that is

admissible against only some defendants, and 'spillover' effects where the crimes of some defendants are more horrific or better documented than the crimes of others." United States v. Innamorati, 996 F.2d 456, 469 (1st Cir. 1993). However, "it is settled that defendants are not entitled to severance merely because it would improve their chances of acquittal," id., and "[c]o-conspirators are customarily tried together absent a strong showing of prejudice," United States v. Perkins, 926 F.2d 1271, 1280 (1st Cir. 1991); see also Zafiro v. United States, 506 U.S. 534, 537 (1993) (observing that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together" before concluding that the co-defendants' adoption of mutually exclusive defenses did not demonstrate a sufficient showing of prejudice).

Arguing in vivid terms that "[t]he Roberto [Caballo] and Llaurador murders featured intensely graphic details about torture, decapitation and dismemberment that swept up Roldan in a sea of bloody evidence irrelevant to his actual criminal conduct," Roldan overlooks the fact that all three murders were listed as overt acts undertaken in furtherance of the conspiracy charged in the first count of the second superseding indictment. These overt acts were all relevant to the jury's consideration of Roldan's criminal culpability for the drug conspiracy. See Casas, 356 F.3d at 112 (affirming trial court's denial of a severance motion by concluding

-52-

that testimony that did not directly implicate the defendant would have been admissible to show the scope of the conspiracy in which he knowingly participated); Brandon, 17 F.3d at 440 ("The government presented sufficient evidence to show that all defendants were involved in a single interdependent conspiracy . . . and most of the evidence at trial was related to the development and operation of that conspiracy.").

Even if the evidence about the Caballo and Llaurador murders was relevant to the drug conspiracy charge, Roldan argues that the gruesome details of these murders unfairly prejudiced him at trial.  This argument overlooks the sordid details of the murder in which Roldan was directly implicated.  Although Roldan did not actually pull the trigger, he aided and abetted the vicious murder of Martin, whose body was riddled with seventeen bullet wounds. Given this graphic evidence, we cannot say that the graphic evidence relating to the Caballo and Llaurador murders was so prejudicial that the case against Roldan had to be severed. Houlihan, 92 F.3d at 1295 (noting that all of the defendants used violence to further the charged conspiracy as part of its justification for rejecting a claim that co-conspirators' trials should have been severed because of prejudicial impact of testimony regarding murders in which some defendants were not implicated).

As we have previously held, the prime factor that a court must consider in evaluating a severance motion "is whether the

court may reasonably expect the jury to collate and appraise the independent evidence against each defendant." Perkins, 926 F.2d at 1281 (internal quotation marks omitted); see also United States v. Di Pasquale, 740 F.2d 1282, 1294 (3d Cir. 1984) ("We must determine whether the jury could reasonably be expected to compartmentalize the evidence against the various defendants and to consider it for its proper purposes.") (internal quotation marks omitted). Despite the length of the trial and the number of witnesses called, this was not a particularly complex case. There were only three defendants and they each bore comparable degrees of culpability. Cf. Zafiro, 506 U.S. at 535 (noting that "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, th[e] risk of prejudice is heightened"). The district court instructed the jury that, although the defendants were joined for trial, it "must decide the case of each defendant and each crime charged against that defendant separately." Innamorati, 996 F.2d at 469 (citing the court's issuance of this customary instruction in concluding that it was unlikely that the jury was confused).

In arguing that he suffered greater prejudice from spillover than the other defendants, Roldan observes that "of the 28 overt acts and numerous allegations of serious criminal activity [identified in the first count of the second superseding indictment] only four paragraphs 1, 3, 7, and 8 set forth

-54-

allegations that include [Roldan]." That argument is misleading in two respects. First, the overt actions cited in those paragraphs allege that Roldan helped to plan and execute multi-hundred kilogram shipments of cocaine into Puerto Rico and that he participated in the murder of a suspected informant, Martin. Far from suggesting that he was a minor player, these allegations present Roldan as a key figure in this conspiracy. Second, the evidence at trial demonstrated that Roldan had many responsibilities within the drug organization that went beyond the overt acts cited in the indictment, e.g., providing security during drug shipments. Therefore, the allegations in the indictment appear to understate his actual involvement. For this reason as well as the other reasons cited, the court did not abuse its discretion in denying Roldan's severance motion.[17]

## 4. **Brady** and a Rule 33 Violation

Roldan also raises a Rule 33 claim, arguing that the district court should have granted him a new trial based on newly-

---

[17]We reject Roldan's related claim of prejudice directed at the court's failure to provide a special limiting instruction to the jury regarding the evidence of the Caballo and Llaurador murders, apart from the customary instruction regarding the responsibility to conduct individualized analyses of the evidence for each defendant. Although Roldan requested such an instruction in the middle of the trial, he failed to remind the court to issue the instruction at the end of the trial. Faced with the defendant's failure to raise a timely objection to the court's omission, we review the proffered instruction for plain error. United States v. Barrett, 539 F.2d 244, 249 (1st Cir. 1976). As can be deduced from our severance discussion, there was no plain error here.

discovered exculpatory evidence.  He fuels his argument by drawing on Brady v. Maryland, 373 U.S. 83, 87 (1963), in which the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

As noted above in our discussion of Rodriguez's Rule 33 motion, if a defendant seeks a new trial on the basis of newly-discovered evidence without making a Brady claim, the defendant must show that: "(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) [a new trial] will probably result in an acquittal upon retrial of the defendant." Wright, 625 F.2d at 1019.  "However, if the new trial motion is based on an alleged Brady violation, the tests for the third and fourth prongs of the Wright framework differ from those applied to an ordinary Rule 33 motion." United States. v. Colon-Munoz, 318 F.3d 348, 358 (1st Cir. 2003).  In the ordinary Rule 33 newly-discovered evidence context, "the evidence must create an actual probability that an acquittal would have resulted if the evidence had been available." Sepulveda, 15 F.3d at 1220. "However, if the government possessed and failed to disclose Brady evidence, a new trial is warranted if the evidence is 'material' in

that there is a 'reasonable probability . . . sufficient to undermine confidence in the outcome' that the evidence would have changed the result." Colon-Munoz, 318 F.3d at 358 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). See also Kyles v. Whitley, 514 U.S. 419, 434 (1995) ("The question [as defined by Bagley] is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

## a. Roldan's First Motion for a New Trial

Roldan presented two written motions and one oral motion for a new trial in the district court. He filed his first written motion on April 23, 2001, claiming that the discovery of three allegedly new pieces of evidence warranted a new trial: (1) a statement purportedly made by Santodomingo at a government debriefing session in which he exculpated Roldan from involvement in the drug conspiracy and Martin's murder; (2) the one page police report citing statements from a confidential informant that supposedly cast doubt on Roldan's participation in the Martin murder;[18] and (3) a letter allegedly written by Pagan denying Roldan's involvement in Martin's murder. On May 22, 2001, in a

---

[18]This is the same document that we described in our earlier discussion of Roldan's claim of prejudice from the denial of his motion for a continuance. See supra Part II.C.1.

lengthy and well-reasoned ruling, the district court denied each claim in the written motion.

### i. Santodomingo's Statement

On April 18, 2001, after the trial in this case, Santodomingo participated in a telephone conference call with his attorney, his case manager, and Roldan's attorney, in which he insisted that Roldan was not involved in the drug conspiracy and that Roldan did not participate in Martin's murder. He claimed to have given this information to a local prosecutor and federal agents during an interview that was held after he decided to plead guilty.[19] Santodomingo also told the participants in the conference call that he would be willing to testify to Roldan's innocence.

The district court held that Santodomingo's statements were insufficient to justify a new trial on Brady grounds. Noting that there was no support in the record for his claim that he was debriefed by federal agents, and that the government denied that any such interview occurred, the court held that the government did not possess exculpatory statements from Santodomingo and, consequently, there was no Brady violation.

---

[19]Simply stating that this alleged debriefing meeting occurred "[a]fter he pled guilty pursuant to plea negotiations," Santodomingo does not state whether this meeting occurred before or after Roldan's trial. For the purposes of our Brady analysis, we will assume that Santodomingo alleges that this debriefing meeting occurred prior to Roldan's trial.

The court then evaluated Santodomingo's statements under the <u>Wright</u> factors to determine whether Roldan was entitled to a new trial under Rule 33. Concluding that Roldan failed to exercise due diligence to obtain exculpatory evidence from Santodomingo prior to trial and that, as a convicted drug-dealing kingpin, Santodomingo would have little credibility with jurors, the court rejected Roldan's claim. More specifically, the court stated that "we dismiss his claim that the belated, self-serving statements given by the ringleader of a drug-smuggling organization denying participation in a murder merits a new trial or even an evidentiary hearing pursuant to Rule 33."[20] There was no error in this ruling.

## ii. The Police Report

The police report, the one page investigative document filled out by a local police officer in Aguadilla, cited information obtained from a confidential informant who said that Martin was murdered by individuals named Atan, Malecon, Roman, and Manteca. Significantly, according to Roldan, the report did not identify Roldan, Pagan or Ramos as having participated in the murder.

---

[20]The government observed in its appellate brief that Santodomingo's assertion that Roldan was not involved in any drug smuggling activity contradicted the statement of facts in his plea agreement as well as a United States Customs Service investigative report, in which Roldan admitted that he operated a drug point with Valle-Lassalle and that he had "performed several drug transactions."

Noting that the government provided a copy of this report to the defendants in one of its pretrial discovery packages, the district court stated that Roldan "is apparently claiming that the government committed a <u>Brady</u> violation by failing to draw [Roldan's attorney's] attention to the potentially exculpatory documents before or at trial." The court quickly dismissed that claim, stating: "Defendant has not cited any case law in support of this proposition, and our own thorough research has not revealed any such authority." Moreover, Roldan's receipt of the report during discovery precluded his claim that it constituted newly-discovered evidence. The court observed: "Had defense counsel thoroughly examined the discovery materials provided by the government, Defendant could have learned of the police report and investigated the matter accordingly. Defense counsel had the evidence available to him at the time of trial." We agree.

### iii. Pagan's Letter

Finally, the court turned to a letter that Roldan allegedly received from his co-conspirator Pagan, in which Pagan said that he killed Martin during a mugging and that Roldan was not involved with the death. Pagan was a fugitive from justice at the time. After noting that the letter "utterly fails to meet the <u>Wright</u> standard" because it was inadmissible hearsay, <u>see</u> Fed. R. Evid. 804(b)(3) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not

admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."), the court stated that it found it "highly troubling" that Roldan was able to contact Pagan to give him his mailing address while Pagan was a fugitive from justice. The court observed that an arrest warrant had been issued for Pagan on July 16, 2000, but that he had not yet been brought into custody. Again, we find no error in the court's denial of the motion for a new trial.

### b.  The Oral Motion at the Sentencing Hearing

Roldan attempted to reopen the motion for a new trial at his sentencing hearing on May 2, 2002. Citing three allegedly new sources of exculpatory information, he stated that: (1) Pagan had now been arrested and was willing to testify on Roldan's behalf; (2) his private investigator identified three new witnesses who could testify as to his whereabouts at the time that Martin was murdered; and (3) his private investigator had discovered that the one page police report that he obtained during discovery was part of a larger investigative file stored at the local police department in Aguadilla. After Roldan completed his arguments, the government gave the court a sealed report from the United States Customs Service pertaining to Pagan's arrest.

The court summarily dismissed Roldan's claims, again concluding that the new evidence would not have altered the result of the trial and that it was not going to reconsider its denial of

the new trial motion. Although the court did not cite lack of diligence in its ruling, we note that there is no evidence that Roldan tried to locate any of these exculpatory witnesses, one of whom was his sister, prior to or during the trial. Nor was there evidence that he tried to obtain the larger police investigative file from the local police department. On this ground as well, the material cited by Roldan at the sentencing hearing did not meet the requirements of the Wright test.

Roldan's effort to raise a Brady claim on the basis of the police investigative file is also unpersuasive. He claimed, without authority, that once the government saw the one page investigative report, it had a duty under Brady to contact the local police investigators, obtain a complete copy of the investigative file, and turn any exculpatory material over to the defense. There is no evidence that the government was working with the local police on this case, cf. Kyles, 514 U.S. at 437 (stating that individual prosecutors have the duty to learn about evidence known to others acting on the government's behalf), and there is no support for such a dramatic expansion of the Brady doctrine. Since there is no evidence that the government possessed a copy of the file prior to trial, there was no Brady violation here.[21]

---

[21]The record indicates that Roldan has continued to try to obtain a copy from the Aguadilla Police Department of this investigative report on grounds, and under circumstances, that are less than clear. These continuing efforts do not affect our analysis of the court's disposition of Roldan's oral motion for a

-62-

Finally, the court stated that the sealed statement from the Customs Service regarding Pagan's arrest did not exculpate or otherwise aid Roldan. We reviewed the document and agree with the district court's assessment.

## c. Roldan's Third Motion for a New Trial

Roldan filed a renewed motion for a new trial on March 12, 2003, while this appeal was pending. Once again, he claimed that Pagan was willing to testify that Roldan had nothing to do with Martin's murder. He submitted a two page unsworn statement signed by Pagan on October 10, 2002, in which Pagan stated: "Luis Roldan-Cortes A.K.A. Wisi had nothing to do with the murder of James Martin Rodriguz and I told this to the US Attorney who came to see me in February of 2002." The district court was again unimpressed:

> Pagan-Cerezo is a recently-captured fugitive who has admitted to, and more recently pled guilty to, the murder at issue here. Given our grave familiarity with the witnesses and participants in this case, we find Pagan-Cerezo to be an individual with very limited credibility.

Noting that part of Pagan's letter was inconsistent with the earlier letter that he sent, the court concluded that "[w]e see little reason to believe that a jury would credit Pagan-Cerezo's testimony over that of the government's informants." The district court was in the best situation to make this judgment. There was new trial.

-63-

no error in the ruling.  Moreover, Roldan's claim that the government withheld exculpatory statements made by Pagan when he was arrested in violation of <u>Brady</u> is misplaced because Pagan was not arrested until after the trial and because the sealed document does not contain any exculpatory material.

### 5.  **<u>Apprendi</u> and <u>Blakely</u>**

Roldan claims that the court violated his rights under <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), and <u>Blakely</u> v. <u>Washington</u>, 124 S. Ct. 2531 (2004), by not requiring the jury to determine the quantity of drugs that should be attributed to him.[22] <u>Apprendi</u> held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  <u>Blakely</u>, in turn, clarified that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the defendant</u>."  124 S.Ct. at 2537 (emphasis in original).  While <u>Blakely</u> itself "express[ed] no opinion" on the constitutionality of the Sentencing Guidelines, <u>id.</u> at 2538 n.9, we would be remiss to ignore it completely, particularly in light of the Supreme Court's widely anticipated clarification of how (if at all) <u>Blakely</u> applies

_____

[22]<u>Blakely</u> was decided three months after oral argument in this case.  Roldan subsequently filed a notice of supplemental authority under Fed. R. App. P. 28(j).

to the federal Sentencing Guidelines.  See, e.g., United States v. Booker, 375 F.3d 508 (7th Cir. 2004) (holding Sentencing Guidelines unconstitutional to the extent that they require judicial factfinding), cert. granted, 73 U.S.L.W. 3074 (Aug. 2, 2004).

Roldan's Apprendi/Blakely argument focuses on his conviction and sentence under count one of the second superseding indictment, which charged him with conspiracy to "unlawfully possess with the intent to distribute multi-kilogram quantities of cocaine . . . in excess of five (5) kilograms and multi-hundred pound quantities of marijuana."  Section 841, the provision that contains the relevant sentencing range for this offense, establishes that the range for such a violation "may not be less than 10 years or more than life."  21 U.S.C. § 841(b)(1)(A).  The jury was specifically asked with regard to each defendant if "this conspiracy involve[d] at least 5 kilograms of cocaine," and it answered "Yes" with regard to Roldan.

The jury's finding that Roldan conspired to possess with intent to distribute at least five kilograms of cocaine exposed him to a life sentence under the relevant sentencing statute.  Under post-Apprendi, pre-Blakely law, this fact would end the constitutional analysis because Roldan's life sentence did not "increase[] the penalty for a crime beyond the prescribed statutory maximum" as the term "statutory maximum" was then understood.  Apprendi, 530 U.S. at 490.  But Blakely casts doubt on that logic.

If the district court had calculated the conspiracy sentence solely on the basis of judicial findings of the quantity of drugs involved, see, e.g., U.S.S.G. §§ 2D1.1(b) & 3B1.1, there might have been a Blakely issue here.

On these facts, however, there is no Blakely issue. The district court recognized that Roldan was involved in a murder relating to his drug activity, and applied the murder cross-reference in the drug conspiracy guideline. See U.S.S.G. § 2D1.1(d)(1) (cross-referencing to first degree murder guideline "[i]f a victim was killed under circumstances that would constitute murder . . . had such killing taken place within the territorial or maritime jurisdiction of the United States"). The first degree murder guideline, in turn, mandates a life sentence. See id. § 2A1.1 (setting base offense level of forty-three for first degree murder); id. Ch. 5 Pt. A (mandating life sentence for offense level of forty-three). The jury had already decided that, in the course of the conspiracy, a victim (Martin) was killed under circumstances that would constitute murder had the killing occurred within the federal criminal jurisdiction. In fact, though it is not necessary to the analysis, the jury convicted Roldan (in three different ways) of personally aiding and abetting in that murder.

In sum, application of the murder cross-reference was based on a factual issue decided by the jury, not the judge. Consequently, there was no violation of either Apprendi or Blakely.

## 6. Downward Departure

Finally, Roldan argues that the district court denied his application for a downward departure at sentencing based on an erroneous understanding of its authority to grant such a departure. He does not support this claim with any evidence of the court's misapprehension; he simply notes that the court did not explicitly rule on his request for a downward departure. After reviewing the record of the sentencing hearing, we conclude that the district court understood its authority to grant a departure and that it exercised its discretion to refuse to do so. Accordingly, we lack jurisdiction to review the court's refusal to depart. See United States v. Rodriguez, 327 F.3d 52, 54 (1st Cir. 2003).

## III.

For the foregoing reasons, we VACATE Genao's convictions on counts two and three of the second superseding indictment and REMAND to the district court for a new trial on those charges if the government wishes to so proceed, and for resentencing. We AFFIRM Genao's conviction on count one as well as the convictions and sentences of Rodriguez and Roldan.

**So Ordered.**

**Appendix**

**Roster of Conspiracy Members and Other Individuals Involved in the Case**

| Name | Relationship to the Conspiracy | Current Status |
|---|---|---|
| Raul Santodomingo-Romero | A leader of the conspiracy | Indicted in the first superseding indictment and pled guilty |
| Victor M. Valle-Lassalle, a/k/a "Manolo" | A leader of the conspiracy | Indicted in the second superseding indictment and pled guilty |
| Omar Genao-Sanchez, a/k/a "Omi" | Member of the conspiracy | Indicted in the second superseding indictment and convicted at this trial |
| Jose Rodriguez-Marrero, a/k/a "Zurdo" | Member of the conspiracy | Indicted in the second superseding indictment and convicted at this trial |
| Luis Roldan-Cortez, a/k/a "Wisi" | Member of the conspiracy | Indicted in the second superseding indictment and convicted at this trial |
| David Rafael Ramos-Rivera, a/k/a "Pecas" | Member of the conspiracy | Pled guilty and became a government informant |
| Javier E. Soto-Alarcon, a/k/a "Chester" | Member of the conspiracy | Pled guilty and became a government informant |
| James Martin-Rodriguez, a/k/a "Kiri" | Member of the conspiracy | Murdered after he became a government informant |

| | | |
|---|---|---|
| Carlos Roberto Rodriguez Torres, a/k/a "Robert Caballo" | Member of the conspiracy | Murdered when he threatened to alert Colombians that Valle-Lassalle stole some cocaine from them |
| Edward Llaurador Rodriguez | Member of the conspiracy | Murdered after he became a government informant |
| Jose Hernandez-Jimenez, a/k/a "Chelo" | Member of the conspiracy | Murdered by a rival drug gang |
| Anibal Pagan-Cerezo, a/k/a "El Cojo" | Member of the conspiracy | Indicted in the second superseding indictment and pled guilty |
| Nicholas Peña Gonzalez | Member of the conspiracy | Indicted in the second superseding indictment and pled guilty |
| Angela Ayala | Fellow smuggler | Charged in a separate conspiracy |
| Henry Pamias, a/k/a "Macho from Cataño" | Fellow smuggler who helped to transport some of the organization's smuggling loads | Charged in a separate conspiracy |